EVERETT RYAN *et al.*, Plaintiffs-Appellees, *v.* JONATHAN K. BLAKEY *et al.*, Defendants-Appellants.

Fifth District   No. 77-510

Opinion filed May 1, 1979.

340

Pope and Driemeyer, of Belleville, Lord, Bissell & Brook, of Chicago (W. Thomas Coghill, Jr., Forrest L. Tozer, Richard E. Mueller, and Hugh C. Griffin, of counsel), for appellant International Harvester Company.

Michael B. Constance and Edward J. Szewczyk, both of Donovan, Hatch & Constance, of Belleville, for appellant Jonathan K. Blakey.

Holtkamp & Beckemeier, of St. Louis, Missouri, and C. E. Heiligenstein, of Belleville (Gilbert Beckemeier and Brad L. Badgley, of counsel), for appellees.

Mr. JUSTICE KARNS delivered the opinion of the court:

This cause of action arose out of an automobile collision in which defendant, Jonathan K. Blakey, drove his automobile through a stop sign and flashing overhead stoplight into the passenger side of a pickup truck manufactured by defendant, International Harvester Company, and driven by plaintiff, Everett Ryan. Mr. Ryan was returning home from a camping trip with his wife and four minor children. A few seconds after impact, the truck burst into flames resulting in the death of two of the children and burns to the survivors. Mrs. Ryan suffered severe and permanent disabling and disfiguring injuries. Plaintiffs brought suit against Blakey alleging negligence in the operation of his automobile and against International Harvester Company in products liability alleging an unreasonably dangerous gasoline containment system. The jury returned verdicts in favor of Everett Ryan and Lorraine Ryan, his wife, against both defendants for $101,000 and $3,000,000 respectively; for each of the surviving children against Blakey only for $1,000 and for each of the deceased children against Blakey only for $24,000. The trial court found the verdicts in favor of Lorraine Ryan and Everett Ryan excessive and ordered remittiturs of $450,000 and $1,000 respectively, which plaintiffs accepted. The defendants now appeal the judgments entered against them arguing numerous errors, including the excessiveness of the judgments in favor of Mr. and Mrs. Ryan.

At the time of the accident, plaintiffs were traveling west on Douglas-Millstadt Road in their pickup truck on which a slide-in camper was attached. Mr. and Mrs. Ryan were in the cab of the truck and the four children were in the slide-in camper. Defendant Blakey was traveling south on Floraville Road which intersected the Douglas-Millstadt Road. He drove through the intersection without stopping at a speed estimated from 20 to 50 mph into the passenger side of the westbound truck. The impact was so severe that the automobile and pickup truck-camper were virtually demolished. The right steel frame rail of the truck was permanently damaged; its drive shaft was broken in half; the gasoline tank burst open at the seam; and holes were torn in the floor of the cab on the passenger side near the transmission hump. The force of the collision caused the truck-camper to skid a great distance across the center line of the highway to a point southwest of the place of impact. When the truck

came to a stop, the camper in which the children were riding was hanging upside down from the side of the truck.

Mr. Ryan testified that immediately upon impact he smelled and felt gasoline on his neck and back. Instantaneously, there was fire across the back of his shirt and head. The first flash of flame Mr. Ryan noticed was behind him in the cab. When he was able to open his door, he pulled his wife out of the truck and jumped and rolled on the ground to put out the fire. Over the objection of defendant Harvester, plaintiffs introduced into evidence a hospital admission record which contained a free hand drawing made by an unidentified person depicting a burn on the back of Mr. Ryan's neck. Photographs after the accident, however, revealed no noticeable burns on the neck. In addition, the treating physician testified that Mr. Ryan suffered no neck burns.

Two of the children escaped through a small hole in the camper. The other two children died before help could reach them. Lorraine Ryan testified that she could not remember anything about the accident or events occurring approximately one month thereafter. While she was testifying to the extent of her injuries, a woman juror left the jury box crying, "I am sorry, I can't take any more." Both defendants immediately moved for a mistrial. Upon interrogation by the court out of the presence of the other jurors, the juror stated that she would be fair and impartial and would be able to follow the jury instructions given at the close of the trial. The court then denied the mistrial motions.

As the major controversy in this action centers on the placement and operation of the fuel containment system, it is necessary to describe its workings in detail. The vehicle, a 1965 International Harvester pickup truck, contained a rectangular 20-gallon steel gas tank and a 16-inch long metal filler pipe. The tank consisted of two halves welded together along a seam. It was connected to the frame of the truck by metal straps beneath the floor of the cab on the passenger side. The filler pipe system had two parts: a six-inch metal pipe which extended from the tank through the floor of the cab behind the passenger seat and another metal pipe which extended from the truck behind the passenger door fitted with a gas cap at its end. The two filler pipe sections were connected by a flexible neoprene coupling secured by two metal hose clamps at a point six inches above the floor of the cab.

Plaintiffs theorize that the placement of the gasoline filler pipe inside the cab of the truck was an unreasonably dangerous condition which proximately caused the injuries to plaintiffs. They claim that the severe impact of the collision caused the filler pipe to separate at its weakest link, the neoprene connection. The gasoline from the tank then "hydrauliced" as a result of the compression of the tank and passed through the broken filler pipe spraying the plaintiffs with gasoline which instantly ignited.

Defendant Harvester contends that the gasoline tank burst on impact causing gasoline vapors to escape into and around the cab. These vapors were ignited by a spark from the broken drive shaft which was dragging along the roadway, and a flash fire ensued engulfing the inside and outside of the cab.

Three eyewitnesses were called to testify to the location of the flames, and specifically whether they were confined to the cab of the truck. Norman Simmonds, one of the eyewitnesses, testified that he was in his house located approximately 1000 feet from the intersection when he heard the collision. Upon looking towards the scene of the accident, he immediately saw flames, mainly on the passenger side of the cab, rising at door level and above. He stated that he saw no flames under the truck or on the pavement. On cross-examination, however, Simmonds testified that he probably was not looking in the area under the truck because his main focus was on the flames concentrated on the passenger's side. As the flames were so intense, he could not determine whether they were outside or inside the truck.

Shirley Simmonds, the wife of Norman Simmonds, was walking across a field close to her home when the accident occurred. Upon impact, she looked and noticed flames coming from the passenger side of the cab. She did not recall seeing any flames under the truck or on the road. On cross-examination, she testified that she could not say whether the flames were inside or outside the truck.

John Campe testified that on the date of the accident he was driving one-eighth of a mile behind Blakey's automobile on Floraville Road. He saw Blakey go through the intersection and knew that a collision was inevitable. He first believed that the pickup truck had hit Blakey's automobile in the side. Approximately two to five seconds after the impact, he saw flames inside the cab of the truck coming out of the passenger's window. He believed the truck had rolled over, a fact denied by Mr. Ryan and Shirley Simmonds.

Five expert witnesses were called to testify, two by plaintiffs and three by defendant Harvester. Plaintiffs' experts were Jay Bolt, a professor of mechanical engineering at the University of Michigan, and Paul O'Shea, a consultant in the automobile research business. In the opinions of Professor Bolt and Mr. O'Shea, the fire started inside the cab when gasoline spilled therein after the neoprene coupling separated. To arrive at this conclusion, both experts apparently relied on plaintiffs' attorney's representations that the fire was confined exclusively to the cab compartment of the truck. For example, the following exchange occurred between plaintiffs' attorney and Professor Bolt on redirect examination:

"Q. * * * [D]id you rely upon the witness's testimony in this case to form that opinion as to where the fire started, whether it was internal or outside of that cab * * *.

A. Yes.

Q. Okay.

A. I think we relied in part or in good measure on the testimony of those there.

Q. Now, in your judgment, Professor Bolt, or in your opinion, had there been an external ignition—originally or initially— underneath and in the back area—underneath this truck—wouldn't there be flame visible to witnesses here underneath the truck, from spilling gasoline?

A. I would certainly expect so.

Q. Do you understand and did you understand in this case that all the witnesses agreed that the first fire that they saw was within the cab?

MR. COGHILL [counsel for Harvester]: Your Honor, I will object also to the form of the question * * *.

THE COURT: As to the form of the question

Q. Were you aware, Professor Bolt, that all the witnesses agreed—

MR. COGHILL: This is the same thing, your Honor; he is stating it in the same way. I am going to object to that * * *.

THE COURT: As to the form of the question.

Q. Did you understand the testimony in this case to be—

MR. COGHILL: Your Honor, I will again object * * *

THE COURT: Let him—

MR. HEILIGENSTEIN [counsel for plaintiffs]: Let me finish.

THE COURT: Let him finish the question.

MR. COGHILL: Then I think it is too late.

THE COURT: Proceed, Mr. Heiligenstein.

Q. Do you understand that the witnesses in this case all testified, sir, that the only fire that they saw was in the area of inside the cab initially?

MR. COGHILL: Your Honor, I will object to Mr. Heiligenstein testifying, and move that it be stricken, and the jury instructed to disregard it.

THE COURT: Overrule the objection; he may answer.

A. Yes, I understood that to be the testimony of the witnesses."

In addition, in the hypothetical posed to Mr. O'Shea concerning the origin of the fire, plaintiffs' attorney asked him to assume that after the impact the "flames were inside the cab only" and that the three eyewitnesses saw flames in the cab. While expressing his opinion which supported plaintiffs' theory, he stated that he took into consideration "* * * the eye-witnesses who saw the fire inside the cab, and with no fire outside on the ground initially—understanding that and believing that then you have to go and look how that fuel got inside

the cab—with this arrangement that International Harvester had, it is very easy for the fuel to get inside the cab, so my opinion is that the eye-witnesses saw what they said they saw."

Defendant Harvester's experts were John Kennedy, a fire and explosion investigator, Harrison Brink, an accident fire expert and former professor at the University of California at Los Angeles, and Benjamin Riley Vian, a mechanical engineer employed by Harvester. Brink and Vian testified that in their opinion a spark from the broken driveshaft caused the gasoline vapors that had escaped upward from the burst tank to ignite. Mr. Brink stated that a person who felt this vapor could conceivably experience a sensation of having liquid gasoline on him. He added that although he had been critical in his writings of a gasoline containment system within a passenger compartment, he did not believe that such a system was unreasonably dangerous under the factual circumstances presented in this case.

During the course of Mr. Kennedy's testimony, counsel for Harvester posed a hypothetical to determine whether there could have been ignition on the outside of the pickup truck.

"MR. COGHILL: Mr. Kennedy, let me ask you * * * to assume that * * * this pick-up truck * * * was traveling in a westerly direction * * * at an intersection * * * and that approaching the intersection from the right of that truck was a Chrysler automobile * * *. I want you to further assume that * * * the front of the Chrysler automobile collided with the right side of International Harvester pick-up truck in the general area of the passenger door * * *. I want you to further assume that at the time of the actual impact * * *, the Chrysler automobile was traveling at the speed ranging from 30 to 50 miles per hour. I want you to further assume that the gas tank on the International Harvester pick-up truck * * * is almost below the right door of the passenger door * * *. I want you to further assume that the damage shown in these photographs, exhibits * * * was done by the impact * * *. Now, assuming those facts * * * if on impact * * * there had been a fire inside the cab of the pick-up truck, do you have an opinion based on reasonable scientific certainty as to whether there would have been ignition on the outside of the pick-up truck?"

Plaintiffs objected to the hypothetical because it failed to state that the eyewitnesses testified that the initial ignition was inside the cab and that the impact speed was only 20 to 30 mph. The trial court sustained the objection "as to the speed and as to the testimony of the witnesses as to the first view as to where the fire was." A discussion followed:

"MR. COGHILL [Counsel for Harvester]: I believe Mr. O'Shea

gave his opinion that the impact speed was 35 to 40 miles per hour
* * *

THE COURT: I would still sustain the objection.

MR. COGHILL: Let me ask you this, Mr. Kennedy, under the circumstance hypothesized—you sustained on the speed?

THE COURT: On the speed and as to the testimony that is in the record as to the first observation of where the fire was."

Thereafter, defendant Harvester moved for a mistrial asserting that the eyewitness testimony did not conclusively establish where the fire originated and that the trial court improperly commented on the evidence by agreeing with plaintiffs that the fire was originally on the inside of the cab. The motion was denied.

At trial, plaintiffs sought to demonstrate a principle of hydrology by offering plaintiffs' Exhibit 98. The demonstration was to show that if a container of liquid is suddenly compressed the liquid will displace to any available open space; or if there is no opening, it will exert pressure on the walls of the container causing it to break. Defendant Harvester objected to the giving of this demonstration apparently on the grounds that it sought to simulate the operation of the fuel system when a gas tank is rapidly compressed.

A brief description of the apparatus of Exhibit 98 is necessary to understand Harvester's objection. A rectangular metal box was mounted on a plywood base. A small circular plastic tube extended upward from the metal box. A second plastic tube was attached to the top of the first tube with a black plastic ring joining the two sections. The top end of the upper section was sealed with a plastic cap. The lower tube extended down through the metal box and out its side where it was connected to rubber hosing. This rubber hose was connected to a soft rubber bottle filled with water. A clear piece of plastic was placed in a horizontal position a few inches above the metal box but below the black plastic ring. A small hole was cut in the plastic to permit the plastic tubing to extend upwards. Defendant Harvester compares the metal box to a gas tank; the plastic tubing to a filler pipe; the black plastic ring to a neoprene coupling; the plastic cap to a gas cap; and the clear plastic to the floor of the cab of the truck.

Over Harvester's objection the trial court admitted the exhibit and instructed the jury that the demonstration was limited to showing an example of this hydraulic principle. Mr. O'Shea, one of plaintiffs' experts, then squeezed the water bottle forcing the water through the rubber hose and into the plastic tubes. The pressure of the water caused the plastic tubes to separate at the black plastic ring causing water to spill on top of the clear piece of plastic. Although the demonstration was expressly

limited to an exhibition of a hydraulic principle, Mr. O'Shea compared it to plaintiffs' theory of the separation of the neoprene coupling.

"Q. Mr. O'Shea, would you tell the jury generally now what happened, why this cap flew off?

A. What happened as I see, this fluid—because you are pressing it, and when it is pressed—it isn't like air \* \* \* you can't squash it—consequently, it has to go somewhere, so that when you drive— or impact this tank in the side—in here that is about it—in this particular case that side of the exhibit we have here, the fluid wants to get out—it is pushing it, consequently, when it does that, there is a separation of the neoprine [sic] coupling the fluid goes into the same place that the people are sitting."

In his closing argument, plaintiffs' counsel represented to the jury that the three eyewitnesses agreed that the fire was inside and not outside the cab. Counsel first stated that "we have three outside disinterested witnesses with the same or identical statements or sworn testimony to you as to what happened." He then proceeded to state: "[I]n in this particular case, the three people who observed this, observed the fire inside the cab and not outside the cab initially." He later added that "the eyewitnesses told you that that fire started and emanated inside that truck and inside that cab \* \* \*." When counsel discussed the plausibility of defendant Harvester's theory of the cause of the fire, he concluded that "[i]f you believe that happened [Harvester's theory of the broken prop shaft], of course, you are going to have to ignore the eyewitnesses."

At the end of plaintiffs' case and again at the conclusion of all evidence, defendant Harvester moved for a directed verdict in its favor. In addition, Harvester moved for a directed verdict in favor of plaintiffs and against defendant Blakey. The trial court denied Harvester's directed verdict motions and submitted the entire case to the jury.

■■ The concept of strict liability, firmly rooted in our notions of public policy, presents the difficult task of determining under what circumstances a manufacturer will be liable for injuries sustained as a result of the use of its product. Previous decisions construing Illinois law make it clear that strict liability will be imposed on the manufacturer of a product which is unreasonably dangerous to a user or consumer by virtue of a defective condition or design. *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965); *Buehler v. Whalen*, 41 Ill. App. 3d 446, 355 N.E.2d 99 (5th Dist. 1976), *aff'd*, 70 Ill. 2d 51, 374 N.E.2d 460 (1977).

■■ In the production and design of automobiles, the manufacturer has the duty to construct a vehicle which does not subject its occupants to an unreasonable risk of injury in the event of a collision not itself caused by the alleged design defect or dangerous condition. (*Nanda v. Ford Motor Co.*, 509 F.2d 213 (7th Cir. 1974); *Buehler v. Whalen.*) This duty,

however, has never been extended by Illinois courts to require a manufacturer to design and build a crash-proof vehicle.

To recover against a manufacturer under strict liability, a plaintiff must establish that the injury resulted from a defect or condition in the product, that the defect or condition was unreasonably dangerous, and that it existed at the time it left the manufacturer's control. (*Nanda v. Ford Motor Co; Ostendorf v. Brewer*, 51 Ill. App. 3d 1009, 367 N.E.2d 214 (4th Dist. 1977).) In the present controversy, defendant Harvester denies that the placement of the filler pipe inside the cab of the pickup truck was an unreasonably dangerous defect; but if we should assume that it were, it vigorously argues that such defect or condition was not the proximate cause of the fire and plaintiffs' injuries. In support of its position, Harvester sought to prove that the injuries to plaintiffs were caused as a result of the bursting of the gasoline tank below the passenger seat of the truck and not the separation of the filler pipe at the neoprene coupling. Harvester argued, and all the experts agreed, that the location of the gasoline tank did not constitute an unreasonably dangerous condition or design defect.

Harvester contends that it did not receive a fair trial because the testimony of the three eyewitnesses to the incident was repeatedly misrepresented by plaintiffs' counsel, plaintiffs' experts and the trial court. This testimony was critical to the theories of plaintiffs and Harvester in that it was the only evidence of the initial location of the fire. Harvester asserts that plaintiffs' counsel repeatedly misstated the testimony of these witnesses during the presentation of the evidence at trial and the closing arguments; that plaintiffs' experts erroneously based their opinions of the fire's origin on this misstated testimony; and that the trial court likewise misstated this evidence before the jury and consequently prevented Harvester from presenting its theory to the jury by use of a proper hypothetical.

We agree with Harvester that plaintiffs' counsel improperly utilized the testimony of these witnesses. A careful reading of the record reveals that their testimony was ambiguous. Although both Shirley and Norman Simmonds testified that they saw flames on the passenger side of the truck, they could not determine whether the flames were inside or outside the truck. The one witness to observe the flames inside the cab was John Campe, who erroneously saw the pickup truck hitting Blakey's automobile and then rolling completely over. Plaintiffs' counsel, however, asserted on numerous occasions that the uncontroverted evidence showed that the three eyewitnesses initially observed the flames only inside the truck.

■■ Plaintiffs' experts relied extensively on this erroneous interpretation of the eyewitness testimony in forming their opinions that the fire started

in the cab after the filler pipe separated at the neoprene coupling. In the present controversy, plaintiffs' attorney prompted Professor Bolt on redirect examination to state that the three eyewitnesses to the accident initially saw the fire confined exclusively to the cab of the truck. An expert witness may be asked to assume the truthfulness of facts testified to, but may not be called upon to decide any controverted fact in issue. (*Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 364 N.E.2d 650 (1st Dist. 1977).) While it was proper for Professor Bolt to testify as to the cause of the fire based upon assumed but disputed facts, it was improper for plaintiffs' attorney and Professor Bolt to misrepresent the testimony of the eyewitnesses before the jury. The eyewitness testimony was critical to the outcome of this controversy as indicated by Professor Bolt's testimony that in the absence of the eyewitnesses it would be impossible to determine from the physical evidence where the fire originated. It was therefore imperative that the jury not be influenced by misleading statements concerning the nature and content of this testimony.

Mr. O'Shea also believed that the testimony of the witnesses to the accident indicated that the fire started within the cab compartment. In the hypothetical question posed to Mr. O'Shea, plaintiffs' counsel incorporated a partial version of the eyewitness testimony. A hypothetical question should incorporate all of the undisputed facts in evidence which are relevant and material to the issue in controversy, and such disputed facts, assumed to be true, as are relevant and material, and supported by the evidence (Gard, Illinois Evidence Manual 259-60 (1963).) Counsel therefore may pose a hypothetical question assuming as true the fact that the fire started inside the cab of the truck as this version of the occurrence was fairly inferable from the testimony of the three eyewitnesses and Mr. Ryan. (*Friedman v. General Motors Corp.*, 411 F.2d 533 (3d Cir. 1969).) The error associated with Mr. O'Shea's testimony was not that the hypothetical was improper, but that Mr. O'Shea misinterpreted the eyewitness testimony in forming his opinion of the cause of the fire. Mr. O'Shea likewise may be asked to assume the truth of facts testified to; however, a careful reading of the record reveals that Mr. O'Shea went beyond assuming the truthfulness of disputed facts and stated in effect that the eyewitnesses all saw the fire originate within the cab of the vehicle.

It is apparent that the statements of plaintiffs' counsel and the expert witnesses concerning the content of the eyewitness testimony also misled the trial court. When counsel for Harvester posed a hypothetical question to one of his experts, John Kennedy, to establish that the initial ignition was outside the truck, plaintiffs' counsel objected on the grounds that it failed to incorporate the testimony of the eyewitnesses that the initial fire was inside the cab. Thus, plaintiffs' counsel, in effect, requested the trial

court to require the jury not only to assume the truthfulness of facts not clearly established by the record but to take them as proven. Counsel thus fails to distinguish between known or undisputed facts and assumed facts. (See Gard, Illinois Evidence Manual 257-60 (1963).) While it is proper for counsel to object to an opponent's hypothetical question which fails to incorporate known facts relevant and material to the issue, it is improper for counsel to request that his opponent depict controverted facts as facts clearly established by the evidence. The trial court, however, sustained plaintiffs' objection and stated in front of the jury that its decision was based on "the testimony that is in the record as to the first observation of where the fire was." As a result of the trial court's actions, Harvester was prevented from presenting a critical element of its defense, *i.e.*, that the fire originated outside of the cab compartment.

■ In addition, we note that "[a] court should be conscious of the fact that it is the dominant figure in the courtroom in any jury proceeding and that an inadvertent comment on the evidence, or its attitude of belief or disbelief can influence the jury." (*Gabosch v. Tullman*, 21 Ill. App. 3d 908, 913, 316 N.E.2d 226, 230 (1st Dist. 1974); *Hickey v. Chicago Transit Authority*, 52 Ill. App. 2d 132, 201 N.E.2d 742 (1st Dist. 1964).) Clearly, if the trial court was misled to believe that only plaintiffs' theory was consistent with the testimony of the eyewitnesses, the inescapable conclusion is that the jury was likewise misled.

During the closing arguments, plaintiffs' counsel continued to misstate the content of the eyewitness testimony. Although counsel has a wide latitude in his closing statements and is permitted to present the evidence in the light most favorable to his case (*Saputo v. Fatla*, 25 Ill. App. 3d 775, 324 N.E.2d 34 (1st Dist. 1975); *Goldstein v. Hertz Corp.*, 16 Ill. App. 3d 89, 305 N.E.2d 617 (1st Dist. 1973)), he is not permitted to create his own evidence. (*Champion v. Knasiak*, 25 Ill. App. 3d 192, 323 N.E.2d 62 (1st Dist. 1974).) In this case, the repeated references by counsel during the presentation of the evidence and the closing arguments concerning the nature of the testimony of the three eyewitnesses had the cumulative effect of creating evidence not supported by the record.

■ Considering the significance of this testimony on the outcome of this controversy, we believe that Blakey and Harvester were prejudiced by the misstatements of the evidence by plaintiffs' counsel, plaintiffs' experts and the trial court, and consequently did not receive a fair trial. Accordingly, we hold that Blakey and Harvester are entitled to a new trial on all issues.

Harvester argues, however, that it was entitled to a directed verdict or judgment *n.o.v.* alleging that the eyewitness testimony could not support plaintiffs' theory of the cause of the fire. Under the *Pedrick* standard of review, "verdicts ought to be directed and judgments *n.o.v.*

entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).

In the present controversy, there was sufficient evidence that would warrant submitting the case to the jury. Although much of the evidence presented by plaintiffs was disputed by Harvester, when viewed in the light most favorable to plaintiffs, it gave rise to a reasonable inference that plaintiffs' theory was true. One eyewitness, John Campe, saw the fire inside the cab of the pickup truck. The other two eyewitnesses observed flames concentrated on the passenger side of the cab. In addition, Mr. Ryan testified that he felt raw gasoline on the back of his neck. In light of this and other testimony presented at trial and the reasonable inferences therefrom, a jury could reasonably have concluded that the filler pipe separated at the neoprene coupling causing gasoline to spray inside the cab. Although Harvester's theory of the origin of the fire is plausible, it is unnecessary for plaintiff to disprove every possible cause of the injury other than the one alleged. (See *Ostendorf v. Brewer*, 51 Ill. App. 3d 1009, 1013, 367 N.E.2d 214, 217.) Accordingly, Harvester's motions for a directed verdict and judgment *n.o.v.* were properly denied.

We note that in a case of this magnitude trial errors are inevitable. Not surprisingly, Harvester asserts the presence of numerous trial errors on appeal which we need not address in light of our holding. Nevertheless, we feel compelled to comment on some of the more flagrant examples of trial error.

With respect to the alleged demonstration of a hydraulic principle, it is apparent that plaintiffs were more interested in simulating the separation of the neoprene coupling than demonstrating the principle of "hydraulicing." For example, in explaining the alleged demonstration, plaintiffs' expert, Paul O'Shea, stated that when "the fluid wants to get out * * * there is a separation of the neoprine [*sic*] coupling [and] the fluid goes into the same place that the people are sitting." The law is well settled that reconstruction experiments are incompetent without showing that the essential elements of the experiment are substantially similar to those existing at the time of the accident. (*Sansonetti v. Archer Laundry, Inc.*, 44 Ill. App. 3d 789, 358 N.E.2d 1142 (1st Dist. 1976); *Thomas v. Chicago Transit Authority*, 115 Ill. App. 2d 476, 253 N.E.2d 492 (1st Dist. 1969).) No foundation evidence was introduced tending to prove that the exhibit, composed mainly of plastic, resembled the fuel system of the truck; nor was any evidence introduced showing that the experiment recreated the collision of the two vehicles. Although the trial court expressly limited the demonstration to an example of a hydraulic principle, the jury nevertheless had the opportunity to observe a

reenactment of the accident as alleged by plaintiffs. (*Cf. French v. City of Springfield*, 65 Ill. 2d 74, 357 N.E.2d 438 (1976).) In any event, there is no justification for the use of an elaborate experiment or expert testimony to demonstrate a common physical principle which can be shown with the simplest of apparatus or described without any forensic aid or expert witness. *Hernandez v. Power Construction Co.*, 73 Ill. 2d 90, 382 N.E.2d 1201 (1978).

We also note that plaintiffs' counsel made various improper and prejudicial comments in his closing argument. In particular, he equated the jury with consumer advocates, introduced alleged facts which had no evidentiary basis at trial, and interjected his personal feelings of the case. For example, he stated:

"[T]he injuries are primarily the responsibility of the International Harvester Company who has got, without a question, a Molotov cocktail on wheels. The reason that they are nervous about this case is because they have got other Molotov cocktails on wheels out on the highway and it makes them nervous like it would any big corporation that has vehicles out on the highway when a particular design has been determined by a Court or jury that it is not reasonably safe when that vehicle is involved in a collision and that is why people like Ralph Nader and Harrison Brink and Berwyn Severin, who actually was in charge of the UCLA test and Mr. O'Shea and other people have criticized lines of production.

Mr. Coghill [counsel for Harvester] stands up here and in his effort to say a case has not been proved, he spends his whole argument ridiculing Professor Bolt and Paul O'Shea. What big stumbling idiots unfortunately were asked to come to testify. Well, let me say this; if we people who are the public didn't have some type of consumer protection by these stumbling idiots like Ralph Nader and some of these other people, where in the world would we be?

\* \* \* They condemned all production whether it was American Motors, whether it was Ford, whether it was the Jaguar or whether it was a Mercedes. It is the principle they were condemning, the principle of having fuel blown inside a passenger compartment on a collision. And they took on all the big boys. Let me appeal to you, how can you with your good faith condemn people who are fighting against the big boys to get rid of gas tanks and filler spouts inside of a car or inside of a truck.

\* \* \* I feel and I have heard \* \* \* for some years what these consumer advocates have been writing, have testified before Congress about, have had Federal regulations banning fuel systems or filler spouts within passenger compartments of cars, aircraft, school buses. It is all banned.

Why? Because they are all Molotov cocktails on wheels. No one in their right mind would say that that is not dangerous upon impact to have, as an example, the fuel system of an aircraft, whether it is by neoprene coupling or metal, run through the passenger compartment of an aircraft. Why it's ridiculous and thank goodness for these people who are advocates of all of us. * * * [I]t is these people who tackle industry, the vehicle manufacturers, the aircraft manufacturers, it is these people who are the heroes.

I feel most strongly in this case and I did because I knew all of this from the very beginning, that I felt that the real single liability and responsibility for damages in this case are International Harvester's. I felt that way from the day I saw this. I felt that way from the day that I cried when I saw Mrs. Ryan, and I did, and I feel it as strong as I have ever felt anything in my life today. It has been an emotional thing for me. I have laid awake many nights in the last two weeks and I don't know what else to tell you. I lay awake. I was thinking what am I going to tell these people.

I know that this is International Harvester's baby. What am I going to talk about? I am going to tell them that I know it. I have been convinced from the day this thing started. * * * Point the finger where it belongs. Point it to the manufacturer that horribly burned this poor woman and show them that you are as big as they are when they put something out on the street like this. Show people that you can condemn it. You are the consumer advocate now."

After the jury retired to the jury room to deliberate, counsel for Harvester moved for a mistrial on grounds of an improper argument by plaintiffs' counsel. Harvester alleged that plaintiffs improperly referred to consumer advocates and sought to introduce evidence in the closing argument which was not presented in the testimony of the witnesses. Counsel for Harvester stated that he did not object during the argument because he did not want to emphasize the statements made by plaintiffs' counsel. The trial court denied the motion for mistrial.

An attorney must confine his closing argument to those matters that are in evidence or admitted and uncontroverted. (*Foerster v. Illinois Bell Telephone Co.*, 20 Ill. App. 3d 656, 315 N.E.2d 63 (1st Dist. 1974).) While an attorney is permitted reasonably to comment upon the evidence in the record, he is prohibited from indulging in misleading and unreasonable statements introduced for the sole purpose of inflaming the passions or arousing the prejudices of the jury. (*Manninger v. Chicago & Northwestern Transportation Co.*, 64 Ill. App. 3d 719, 381 N.E.2d 383 (5th Dist. 1978).)

■■ ■ In this case, the various statements of plaintiffs' counsel concerning

consumer advocates were intended to transform the jury into a consumer vigilance committee. In addition, the references to the testimony of consumer advocates before Congress condemning the fuel tank system in question and the Federal regulations banning such a system were well beyond the scope of evidence introduced at trial. Plaintiffs' counsel compounded this error in his closing argument by improperly arguing his personal feelings and opinions to the jury. (See *Goad v. Grissom*, 324 Ill. App. 123, 57 N.E.2d 514 (3d Dist. 1944).) Although no objection to plaintiffs' attorney's argument was made until after the jury retired to deliberate its verdict, this court may nevertheless consider such an assignment of error in a case, as the one at bar, where the prejudicial and improper comments deprived the litigants of a fair trial. *Manninger v. Chicago & Northwestern Transportation Co.*

■■ Another trial error which we feel mandates some comment was the improper cross-examination of Harvester's expert witness, Benjamin Riley Vian, by plaintiffs' attorney. After Mr. Vian stated that he did not spend most of his time testifying in court, plaintiffs' attorney read from Harvester's affidavit for continuance the names of cases in which Mr. Vian was to testify. Plaintiffs' attorney then had Mr. Vian state the theories of recovery involved in each suit mentioned in the affidavit. In addition, plaintiffs' attorney went so far as to mention that Harvester was being sued for $30,000,000 in one of these cases. Neither the theories of recovery nor the amounts sought in these suits had any bearing whatsoever upon this particular controversy. The sole purpose in placing this information before the jury could only have been to prejudice Harvester with material irrelevant to this case.

Harvester also argues that plaintiffs were allowed to argue their case in the jury instructions. We are confident that with the adoption of the strict liability instructions by the Illinois Supreme Court Committee on Jury Instructions since the original trial all of the problems with the use of instructions will be resolved.

In conclusion, we have commented upon a number of trial errors because this case will be retried and it is likely that the same mistakes could be repeated. We note, however, that our failure to mention other possible trial errors should not be construed as our unconditional approval of the other procedures utilized by the parties at trial. We highlighted some of the more noticeable trial errors which we believe warranted our attention.

For the reasons stated, the judgment of the Circuit Court of St. Clair County is reversed and remanded.

Reversed and remanded.

JONES and KUNCE, JJ., concur.