JAMES HUBBARD, Plaintiff-Appellee, v. McDONOUGH POWER EQUIPMENT, INC., Defendant-Appellant.—(WOLLGAST SUPPLY, INC., et al., Defendants.)

Fifth District   No. 78-394

Opinion filed March 21, 1980.—Rehearing denied May 1, 1980.

Burton C. Bernard and William G. Kaseberg, both of Bernard Davidson, of Granite City, for appellant.

Jon G. Carlson, Morris B. Chapman, and Paul H. Lauber, all of Chapman, Chapman & Carlson, of Granite City, for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

In a strict products liability action in the circuit court of Madison County, judgment was entered on a jury verdict of $180,000 in favor of plaintiff, James Hubbard, and against defendant, McDonough Power Equipment, Inc. (McDonough), for personal injuries Hubbard sustained while operating a riding lawnmower manufactured by McDonough. However, at the same time judgment was also entered against plaintiff and in favor of the two other defendants, Ruder's Mower Service Sales and Rental Company (Ruder's Mower Service), the retailer of the lawnmower, and Wollgast Supply, Inc. (Wollgast), the distributor. Following the denial of McDonough's post-trial motion which, among other things, sought entry of a judgment *n.o.v.*, McDonough commenced this appeal.

McDonough raises numerous issues in this court, the first of which is whether the trial court erred in excluding evidence of national standards applicable to lawnmowers on such matters as stability and of test results demonstrating that McDonough's lawnmower complied with these standards. Although this matter will be discussed more fully below, we indicate at this point that on the basis of the recent opinion of our supreme court in *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, we must remand this cause for a new trial because of the exclusion of this evidence, sometimes referred to as state of the art evidence. Moreover, since a retrial is necessary, only those remaining issues which either question the necessity of such a retrial or involve errors which might recur upon retrial will be addressed. These issues are: whether the trial court erred in denying McDonough's motions for directed verdict and judgment *n.o.v.*; whether the trial court erred in admitting a certain film prepared by plaintiff and a model depicting a deadman's device; and whether plaintiff presented improper closing arguments.

The riding lawnmower which plaintiff was operating when he was

injured and which he now claims was unreasonably dangerous was manufactured by McDonough in 1967. It was shipped to the distributor, Wollgast, who in turn sold it to the retailer in Collinsville, Illinois, Ruder's Mower Service. In August of 1967, Joe Fernandez of Caseyville, Illinois, purchased this mower from Ruder's Mower Service. Although he owned the mower for almost eight years, he used it only for the first four years or through 1971. During the time Fernandez owned the mower, he had it serviced regularly at Ruder's to keep it in good running order. The last time it was serviced was in April 1974. Fernandez never had any problem with the front end lifting off the ground when mowing his sloping property.

Around July 16, 1975, Fernandez sold the mower to plaintiff's father, Frank Hubbard. The mower was purchased for use in mowing Hubbard's property in Collinsville, Illinois. Photographic exhibits indicate that the Hubbard residence faced north and was elevated above the back yard, which gently sloped downhill to the south and to the east. A shorter, steeper slope ran downhill to the east from near the southeast corner of the house towards the back of the driveway.

On July 21, 1975, Frank Hubbard used the riding lawnmower to mow the back yard. He mowed for approximately 30 to 35 minutes, following a rectangular pattern which reduced the uncut area with each pass. As he mowed, he moved farther away from the house and as a result mowed up a slightly lesser slope with each circuit since the slope to the east is greatest near the house.

James Hubbard, the plaintiff, relieved his father from the job sometime before 5:30 p.m. The weather conditions were warm and dry. Plaintiff was then 15 years old, 6'1" tall and weighed in excess of 212 pounds. At the time plaintiff started mowing, only a small area remained uncut. With the mower in second gear and set at half throttle, plaintiff began mowing. In making rectangular passes on the uncut area, plaintiff made five or six trips up the slope without experiencing any problems. On each trip to the slope, he was travelling parallel to the back of the house with the ground to the right of the mower sloping upward and to the left, downward. The pitch of the slope decreased with each pass. On plaintiff's last trip up the slope, he was proceeding at a steady rate with the same gear and throttle settings as before. About half way up the slope, the mower seemed to hesitate and jerk. It lifted up and plaintiff fell off the back on the mower's right side. He looked up and saw the bottom of the mower falling onto him. He was able to push the mower away, but in doing so his right hand came in contact with the spinning blade, severely injuring it. Although emergency surgery was quickly performed, plaintiff's right hand later had to be surgically amputated. Plaintiff said

that prior to the machine's hesitating, he did nothing to disturb its forward motion. Depending on the precise location of the accident, the incline was between 15° and 20° off the horizontal.

The mower which was involved in this accident was a Snapper Comet Model 265X. This model was produced by McDonough only in 1967 and 1968, but the basic design of the mower was continued on in later models. The model number indicates that the mower had a 26-inch blade and a five-horsepower engine. The mower was approximately 4½ feet long and weighed about 270 pounds with approximately 70% of its weight over the rear wheels.

The strict products liability count of plaintiff's complaint asserted that this mower possessed an unreasonably dangerous condition at the time it left McDonough's control in one or more of the following respects:

> "a) Said mower was so designed and manufactured as to be top heavy and prone to turn over;
> b) Said mower contained inadequate or no warnings;
> c) Said mower failed to have adequate protection and/or guarding devices to protect persons using it in the proper manner."

At trial the plaintiff's position with respect to the defects of the mower was clarified further as he endeavored to establish two primary points: first, that McDonough's machine possessed a design defect which made it unstable and apt to overturn on inclines of 15° or more, especially when subjected to intentional or unintentional torque disturbance; and second, that at the time this mower was manufactured it was possible to equip it with a deadman's control device which could have stopped the blade quickly enough after plaintiff fell from the mower to have avoided his injury.

Plaintiff's expert witness, Professor John Sevart, established that the most common intentional torque disturbance would follow the release of the mower's clutch and that unintentional torque disturbances would include interruption of fuel to the engine and the wheels' encountering a minor obstruction or a change of terrain. Professor Sevart also testified that the technology existed in 1967 to adapt then existing deadman control devices to the Snapper 265X so that it could have had a blade-stopping time of between one and two seconds after an operator became dislodged from the mower. Sevart estimated that the time which elapsed before plaintiff's injury occurred was between 1½ and two seconds, his best guess being 1 3/4 seconds.

As can be seen from the above recited facts, one of plaintiff's primary objectives at trial was to prove that the mower was defectively designed and unreasonably dangerous because it was dynamically unstable and did

not incorporate a feasible alternative design involving a deadman's control which could quickly stop the mower's blade.

McDonough's first contention on appeal is that, in view of plaintiff's theories, the trial court erred in excluding evidence of national standards with respect to mower stability, deadman's devices and blade stopping time and of McDonough's machine's compliance with those standards. We agree.

On February 17, 1978, plaintiff filed two motions seeking order *in limine*. In part, one of the motions sought an order prohibiting defendants from indicating that McDonough tested the mower or that it tested the mower and found it safe. The second motion sought an order prohibiting defendants from bringing out any matters "dealing with any state of the art defenses" and particularly the following:

"1. Any evidence that the product complied with standards or even that standards exist.

2. Any evidence that the product was tested and certified by the United States Testing Company or any mention of the United States Testing Company, or any mention of the employees of the United States Testing Company, or even to state that such a company exists as all the company does is certify that the lawn mowers meet the current standards.

3. Further, an Order is requested prohibiting defendants from placing any employee of the United States Testing Company on the witness stand."

Following arguments of counsel at a pretrial conference, the trial court granted the above noted portions of the motions over McDonough's objections and entered appropriate orders in *limine*.

As a result of this ruling McDonough was not allowed to present as evidence copies of the various safety specifications for power lawn mowers approved since 1960 by the American Standards Association and the American National Standards Institute. Admission was also denied the 1977 proposed standards of the Consumer Products Safety Commission. All of these documents contained virtually identical standards for the rearward stability of riding lawn mowers. The standards basically required the mower to pass a static performance test establishing that it would not tip over on a 30° incline with 200 pounds in the operator's seat. The documents also reveal that a deadman blade control device had not been recommended for mowers before the 1977 proposed standards of the Consumer Products Safety Commission were formulated. The standard contained therein for riding mowers was that the stopping time of such device should be six seconds from May 1977 and three seconds after 1981. McDonough was also prevented from admitting an

employee's testimony that prior to marketing the Snapper 265X and thereafter performance testing by the company established the stability of the mower. In addition, the court excluded testimony of a vice president of the products testing division of the United States Testing Company that beginning in 1970, he tested the 265X and its successors and found them to be in compliance with existing national standards for riding lawn mowers.

In our opinion, all of this evidence was improperly excluded in view of the recent opinion of *Rucker v. Norfolk & Western Ry. Co.* In *Rucker* our supreme court noted that it had previously held in *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 161, 390 N.E.2d 859, that a plaintiff in a design defect products liability case could attempt to prove such a defect by introducing evidence of feasible alternative designs. (77 Ill. 2d 434, 437, 396 N.E.2d 534, 536.) The court then went on to hold that, by the same token, a defendant in such a products liability case "should be allowed to show that a given alternative design is not required by Federal regulations." (77 Ill. 2d 434, 438, 396 N.E.2d 534, 536.) The court also noted that evidence of compliance with Federal standards is relevant not only to the issue of whether a product is defective but also whether a defective condition is unreasonably dangerous. (77 Ill. 2d 434, 439, 396 N.E.2d 534, 536-37.) If the product is in compliance with national standards, the finder of fact may well conclude that the product is not defective or that the defect is not unreasonably dangerous. Moreover, such evidence does not improperly remove the focus of the inquiry from the product since it mrely indicates that the product, not the manufacturer's conduct, conforms to national standards. 77 Ill. 2d 434, 439, 396 N.E.2d 534, 537.

■■ In the present case plaintiff sought to prove that the mower was defectively designed in two respects and attempted to prove one defect by evidence of an alternative design. Under *Rucker* McDonough was entitled to counter this approach with the excluded evidence showing that the alternative design advocated by plaintiff was not required by national standards and that McDonough's mower complied with the relevant portions of the successive sets of national standards. The exclusion of this evidence is reversible error. This conclusion comes as no surprise to plaintiff's counsel who acknowledged at oral argument that the supreme court decision on the same issue in the *Rucker* case would control the result in this case. At the time of oral argument of this case the supreme court decision in the *Rucker* case had not been filed.

Defendant next contends that the trial court should have directed a verdict in its favor or entered a judgment *n.o.v.* Its main argument in this regard is that there was insufficient evidence to establish the instability of

the mower since Professor Sevart's opinion testimony that the mower was unreasonably dangerous because of its dynamic instability was not based on a hypothetical question covering the facts of the occurrence as related by plaintiff. McDonough also argues that the evidence was insufficient to establish that the mower was unreasonably dangerous because of the absence of a deadman's blade brake device. This argument is based on McDonough's belief that there was insufficient evidence of the feasibility of such a device.

It is well established that verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Judged by this standard, we cannot find that the trial court erred in denying McDonough's motions.

For reasons which will become more evident when we discuss the admissibility of the plaintiff's movie, Professor Sevart should not have been allowed to express an opinion based on the tests depicted by the movie as to whether the mower was so unstable as to be unreasonably dangerous. Nevertheless, other evidence in the case was sufficient to preclude the directing of a verdict or entry of a judgment *n.o.v.* First, assuming the occurrence facts to be as related by plaintiff, the jurors could reasonably find in light of their own observation and experience in the affairs of life that the mower was so unstable as to be unreasonably dangerous and that this defect was the proximate cause of plaintiff's injury. And second, although there was a difference of opinion between the experts as to whether it was feasible at the time of manufacture to equip the mower with a deadman's blade brake device which could have prevented this injury, this difference merely presented a credibility question. A jury could still conclude that the mower was unreasonably dangerous in the absence of such a device and that the absence was the proximate cause of plaintiff's injury regardless of why the mower tipped and unseated him.

McDonough also argues that a judgment *n.o.v.* should have been entered because the jury returned inconsistent verdicts with respect to the three defendants. As we have already indicated, a verdict was returned against McDonough but in favor of the retailer, Ruder's Mower Service, and the distributor, Wollgast.

■■ Although it is well established in Illinois that every person involved in the overall producing and marketing enterprise of a product, including distributors and retailers, is equally liable for injuries caused by a product if it is unreasonably dangerous (*Dunham v. Vaughan & Bushnell*

*Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401; *Sweeney v. Matthews* (1968), 94 Ill. App. 2d 6, 236 N.E.2d 439, *aff'd* (1970), 46 Ill. 2d 64, 264 N.E.2d 170), the verdicts in the present case may not properly be held to be inconsistent and thus compel rendition of a judgment *n.o.v.* for McDonough in view of the manner in which the jury was instructed. The verdicts which, were returned were rendered on a single verdict form which indicated that it was permissible to find against some of the defendants but in favor of the others. Considering the law with respect to the identical liability of everyone in the chain of distribution of a product, the giving of such a verdict form was plainly error and should not be repeated on retrial. Moreover, plaintiff's counsel was permitted in closing argument to emphasize the erroneous option provided by the verdict form and also to suggest that he would "understand" if the jury decided to let Ruder's Mower Service and Wollgast off and find against the "real culprit," McDonough. In view of these circumstances we cannot find that in deciding in favor of Ruder's Mower Service and Wollgast the jury concluded that one or more of the predicates to liability was lacking. Rather, it is more likely that they followed the suggestion of plaintiff's counsel, believing such to be a proper manner in which to shift liability to the defendant who had the most control over the design of the product. Although McDonough objected to the verdict form and the argument of plaintiff's counsel and therefore played no part in the commission of this error, we cannot ignore the practical import of the circumstances which led to the seemingly inconsistent verdicts.

McDonough next contends that there was insufficient foundation testimony developed by plaintiff to justify the admission and viewing of a motion picture depicting experiments performed with a Snapper 265X mower at the direction of Professor Sevart. We agree.

Although the decision whether to admit evidence of experiments rests largely in the sound discretion of the trial judge (*Rockett v. General Motors Corp.* (1975), 31 Ill. App. 3d 217, 334 N.E.2d 764), it is well settled that reconstruction experiments are incompetent unless the essential elements of the experiment are shown to be substantially similar to those existing at the time of the accident (*Ryan v. Blakey* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604; *Sansonetti v. Archer Laundry, Inc.* (1976), 44 Ill. App. 3d 789, 358 N.E.2d 1142; *Rockett v. General Motors Corp.*). After observing the film, we find that the trial court abused its discretion in admitting it since the essential elements portrayed in the film are not substantially similar to those existing at the time of plaintiff's injury.

According to testimony offered on behalf of plaintiff, the offending machine was in good operating order at the time of the accident. It was being operated in second gear and at half throttle with the mowing

blade engaged. Plaintiff was proceeding at a steady rate up an incline of between 15 and 20 degrees without doing anything to disturb the mower's forward motion when it hesitated, jerked and threw him off, apparently as a result of an unintentional torque disturbance.

In stark contrast, the film's test machine was not in good operating condition. Plaintiff conceded at trial that at full throttle the engine was running at 4600 r.p.m. or 1000 r.p.m. in excess of its normal operating speed. This condition, in itself, could have affected the amount of lift off occurring at the mower's front end. This is especially true since an iron bar weighing between 3 and 5½ pounds was attached to the rear of the test vehicle and the mowing blade was kept unengaged during the tests, thereby providing more power to the vehicles rear wheels. In addition, the operating conditions of the test machine in the film were markedly dissimilar to the actual conditions prior to the accident. The tests were performed with the machine starting from a dead stop on inclines of zero, five, 10 and 15 degrees, rather than in motion on a 15- to 20-degree incline, and the torque disturbance used in the tests was a release of the clutch, an intentional disturbance in contrast to an unintentional one such as plaintiff encountered. Moreover, the machine was run in all forward gears, rather than just second, and at full throttle as well as half throttle. These dissimilarities are too numerous and too great to permit admission of the film. What was depicted simply bore no relation to the specific facts of the occurrence related by plaintiff.

The prejudicial impact of the admission of this motion picture was undoubtedly great since several aspects of its presentation were geared towards unfairly preconditioning the minds of the jurors to accept the plaintiff's theory of the case. For instance, the lift-offs achieved in high gears at full throttle, while strictly irrelevant, were quite dramatic. Moreover, the impression of danger conveyed by the test driver's use of a crash helmet could hardly have been missed when Professor Sevart commented during the viewing of the film that the blade was not engaged and the bar on the rear of the mower was installed solely to insure the safety of the test driver.

McDonough also objects to the admission into evidence of a deadman's control device.

During Professor Sevart's testimony, plaintiff was allowed to show to the jury and demonstrate for it a model of a deadman's control device constructed by Sevart. Prior to the demonstration, the professor indicated that although the model used some lawn mower parts, it was not intended to represent the mower but was merely an educational device to demonstrate how a deadman's control device works. He likened the demonstration to a surgeon's use of a spinal column to illustrate his

testimony. Over McDonough's objection, the model was later admitted into evidence, the court noting that it would not go to the jury room and that its limited purpose had been adequately explained to the jury by Professor Sevart. McDonough asserts that the admission of this model was error; we disagree.

■ Our courts have long favored the use and admission of demonstrative evidence which clarifies an expert witness' testimony or assists him in its presentation. (*Feigl v. Terminal R.R. Association* (1975), 30 Ill. App. 3d 55, 332 N.E.2d 416; *Nelson v. Union Wire Rope Corp.* (1963), 39 Ill. App. 2d 73, 187 N.E.2d 425.) In view of this rule, we cannot find that the trial court abused its discretion in admitting the model; however, we do believe that McDonough was harmed when the trial court erroneously permitted the plaintiff in closing arguments to make comments which went far beyond the limited purpose of the model's admission. During closing arguments, plaintiff stated:

"[Plaintiff's counsel] Now, you saw how quickly that blade could be stopped [Model demonstration]. Now, he will get up here and say why that blade can't be stopped. * * * But you saw how quickly that thing stops.

Then Buske comes in here and says, 'well, you shouldn't have that kind of device, because we are going to try to defeat them.' Does he really think that we are all that stupid? How dumb do those people over there think we are? * * *

Now, I tell you what. It is not necessary to have any of these blade contact injuries, and we showed you how with their own design, a few bucks worth of modification would have made all these blade contact injuries obsolete.

Now, the counsel for McDonough Power Company from Georgia is sitting at the end of the table there, and I say to you sir, when you go back to Georgia, you are welcome to take these modifications with you and how they work. You take them, free of charge. Maybe you can prevent more of these injuries. Maybe we won't have to have any more of these injuries if you take that with you, because you certainly had that ability since the early 60's. [Objection overruled.]".

Although it is impossible to say with complete certainty that all of the above-quoted comments referred to the deadman's model, the impression conveyed by these remarks is that the model accurately represents a possible adaptation of the mower which would have prevented plaintiff's injury. Using the model to imply this was improper. Such use far exceeded the limited purpose for which the model was admitted. Plaintiff should refrain from making a similar use of it in the retrial.

McDonough's last contention on appeal is that it was denied a fair trial as a result of the improper closing arguments of plaintiff's counsel. We agree that many of counsel's remarks exceeded the bounds of proper argument.

■■ Plaintiff's counsel spent the greatest portion of his closing arguments in impugning the honesty of McDonough's attorneys and witnesses and in ascribing bad motives to the defendant. This type of argument is improper. As this court stated in *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 730, 381 N.E.2d 383, 391:

> "The constitutional right of trial by jury is not a license for counsel to indulge in abusive and prejudicial conduct in order to gain a verdict, nor does it grant any privilege to embarrass and belittle an adversary before the jury to such an extent that the hope of the adversary to obtain respectful consideration at the hands of the jury is destroyed or seriously jeopardized." See also *Paulsen v. Gateway Transportation Co.* (1969), 114 Ill. App. 2d 241, 252 N.E.2d 406.

■■ We also find from these same remarks that plaintiff's counsel used closing arguments improperly by suggesting that it was the role of the jury to act as consumer advocates and to return a verdict for plaintiff so the lawn mower industry would improve the safety of their products and consequently spare others from similar injuries. The use of closing arguments in a similar manner was disapproved by this court in the recent case of *Ryan v. Blakey* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604. We direct the plaintiff to refrain from making arguments similar to those discussed here on retrial.

For the foregoing reasons, we reverse the judgment of the circuit court of Madison County and remand this cause for a new trial.

Reversed and remanded.

KASSERMAN and SPOMER, JJ., concur.