PHILLIP MANNINGER, Plaintiff-Appellee, *v.* CHICAGO AND NORTH-
WESTERN TRANSPORTATION COMPANY, Defendant-Appellant.

Fifth District No. 77-251

Opinion filed October 12, 1978.

John C. Shepherd, Joseph A. Kral, and Richard B. Specter, all of St. Louis, Missouri, and James P. Daley, of Chicago, for appellant.

Morris B. Chapman and Robert W. Bosslet, of Chapman, Chapman & Carlson, of Granite City, for appellee.

Mr. JUSTICE KUNCE delivered the opinion of the court:

The defendant, Chicago and Northwestern Transportation Company, appeals from a judgment entered on a jury verdict awarding plaintiff $1,500,000.

This is an action in negligence commenced on October 30, 1974, against the Illinois Terminal Railroad, Victor Terrando, and American Hoist and Derrick Company. The Chicago and Northwestern Transportation Company (C & NW) was added as a defendant approximately 14 months after plaintiff was injured. After the close of plaintiff's evidence, the court granted motions for a directed verdict for all defendants except C & NW. C & NW alleged that the trial court erred in failing to grant its motion for judgment *n.o.v.* and that certain actions by plaintiff's counsel deprived it of a fair trial.

At the time of the accident, January 7, 1974, plaintiff was 28 years of age, married and employed by Moss-American, a subsidiary of Kerr-McGee.

C & NW's answer to co-defendant Illinois Terminal's interrogatories listed T. Bridges, F. Chrome, C. Hughes and R. Noah as the train crew which delivered the 17 railroad cars to Kerr-McGee's railroad yard on January 6, 1974. In an amended answer to plaintiff's interrogatories, C & NW listed J. A. Ray, C. L. Voyles, D. C. Voyles, and Charles Hootsil as the crew which delivered the 17 railroad cars.

Kerr-McGee treats railroad ties, which are brought to its Madison, Illinois, plant for processing with creosote. At the time of the accident, plaintiff had been employed by Moss-American for approximately three weeks, the first two of which were spent in the creosoting plant while the last week was spent working in the railyard. Untreated railroad ties are brought to the plant in gondola cars. The untreated ties are unloaded from the gondola car by means of a movable crane which can also function as a train engine and move up to four cars along the tracks. The ties are stacked in the yard for grading. When the ties are to be treated, they are loaded on small railroad cars, called dinkeys, by an immovable crane. These cranes are also called cherry pickers. When working in the yard, plaintiff's duties were to place cables around the treated ties in order to put them on the gondola cars and to move the loaded cars onto the dowell track to be picked up by the railroads. The dowell track curves in a semicircular manner from the main track at a point near the wash house and back to the main track at a point near Kerr-McGee's north end gate. The untreated ties usually enter Kerr-McGee's yard through the south gate, and cars containing the treated ties are usually picked up at the north

end. When the creosoting process has been completed, a railroad is asked to bring the desired number of empty cars so that the treated ties can be placed in them. These empty cars are usually brought into Kerr-McGee's yard through the north gate. Sometimes the railroads are instructed to put the empty gondola cars on a certain track. At other times, the empty cars are placed inside the entrance of Kerr-McGee's yard, and Kerr-McGee moves or spots the cars where it wants them.

The main track between the two switches of the dowell track is approximately 1000 feet. The size of railroad cars varies between 41 feet 6 inches to 52 feet 6 inches. The south end of the main track is crossed by a road built for trucks hauling processing material. Approximately 20 of the small-sized railroad cars could be placed on the main track without fouling or blocking the switch at the north end or the construction road at the south end. A chock must be placed under the cars at the north end of the main track as cars at that point have a tendency to roll north toward the main gate if a chock is not properly placed under the wheels. C & NW was a signer of the Consolidated Code of Operating Rules in 1967. Rule 808e of said rules provides that when switching and placing railroad cars, they must be left where they will fully clear passing tracks or adjacent tracks and where they will not cause injury to employees riding on the side of cars.

On January 7, 1974, plaintiff commenced work by 10 a.m. Many workers did not come to work at the Kerr-McGee plant because of a heavy snowfall the previous night which made streets and roads in the area slick. The dinkey cars kept derailing, and plaintiff's crew, consisting of himself, the crane operator Brandt, and another man, Brown, rerailed the dinkeys. Plaintiff testified that no cars had been moved on either the main track or the dowell track while he was present on the day of his injury. At approximately 3:30 p.m., the crew was using the movable crane to move two loaded gondola cars from a spur track onto the dowell track, which was covered with snow, so that the cars could be picked up by the railroad that night. Plaintiff did not check the switch between the main and dowell tracks at the north end to determine if it were clear before the cars were moved. In order to signal the crane operator to spot the cars, he positioned himself on the front left-hand side of the car farthest from the crane. At that position, there is a stirrup and an iron ladder on which to position oneself. As the train consisting of the movable crane and the Illinois Terminal cars was moving along the dowell track, plaintiff realized that his train could not clear the cars on the main track and signaled the crane operator to stop. The train did not stop, and plaintiff attempted to crawl into the car on which he was riding. Before plaintiff could get completely clear, the train collided with the cars on the main

track which resulted in serious injuries to plaintiff, including the loss of both legs.

James Morey, superintendent at Moss-American on January 7, 1974, testified that he did not see any railroad cars on the dowell track during the hours he worked, 7 a.m. to 3:30 p.m.; however, he did see 17 cars on the main track. When Morey left work on January 6, 1974, he did not see any cars on the main track. Two Illinois Terminal cars were on the dowell track which were subsequently taken to the south end of the plant and loaded with treated ties. These cars were to be returned to the dowell track and became part of plaintiff's train. The two Illinois Terminal cars in plaintiff's train had not been part of the 17 cars on the main track, and plaintiff's crew did not move any of those 17 cars. Kerr-McGee does not conduct switching operations after 3:30 p.m., and the Pinkerton security agency would prevent any unauthorized person from switching cars. When Mr. Morey arrived at the accident scene, the Illinois Terminal car had rebounded approximately one car length from the point of impact, and plaintiff was on the ground approximately five to six feet from the end of the Illinois Terminal car.

Charles E. Hootsil, a switchman for the defendant, testified that he had no independent recollection of delivering 17 railroad cars to the Kerr-McGee plant prior to plaintiff's injuries. At the time of the accident, Mr. Hootsil was a student assigned to defendant's train crew which consisted of Dwight Voyles, Charles Voyles, and James Ray.

Charles Noah, trainman for the defendant, testified that his crew put together the 17-car train in defendant's Madison Yard which is located a short distance from Kerr-McGee. Mr. Noah's crew did not participate in delivering the cars to Kerr-McGee. When delivering cars after Kerr-McGee closed for the day, the usual procedure was to push the cars through the north gate and leave.

Freddy Chrome, conductor for defendant, testified that most of his 21 years of employment with the defendant were spent at the Madison Yard. Mr. Chrome stated that safety procedures did not allow a switch to be fouled; however, the rule was different in an industrial setting. A switch in an industrial setting could be fouled if the train crew had been directed by the industrial user to place the cars at a certain place which would, in effect, foul a switch.

Dwight Voyles, a crewman who delivered the 17 cars to Kerr-McGee, testified that he received no instructions as to where the cars were to be spotted. Ten cars were placed on the dowell track, and seven were put on the main track. The chocks of wood were placed to prevent each of the two sections from moving. Mr. Voyles did not remember if he set the hand brakes on the cars. He was aware of the safety rule that switches

should remain clear, and he was confident that the rule had been obeyed. Mr. Voyles' testimony was corroborated by that of James Ray and Charles Voyles, his father. They did not remember how many cars were delivered or what actions they took on various other days in 1974. They heard about Mr. Manninger's injuries two days after the accident occurred at which time they discussed their work in delivering the 17 cars and concluded that their actions were proper.

William Lomanski, Kerr-McGee plant manager on January 7, 1974, testified that when he arrived at work on January 7, 1974, at 7 p.m., he was aware that 17 cars had been delivered the previous night, but he did not check to determine where they were spotted. Immediately after the accident, he counted 14 cars on the main track. Those cars extended beyond Kerr-McGee's gate. There were three cars on the dowell track. He had seen the three cars moved off the main line and back up to the dowell track, but these cars had been removed from the dowell track prior to the accident. He never did see 10 cars sitting on the dowell track. An examination of the dowell track after the accident indicated that there had been four to five cars on the dowell track at the time of the snow as evidenced by the lack of snow on the tracks. Mr. Lomanski's report of the accident shortly after it occurred did not mention that he had observed movement of C & NW's cars on the day of the accident.

Blondell Brandt, crane operator on plaintiff's train, testified that he had moved many cars prior to the accident and did not remember if he had moved any cars on either the main or dowell track. Mr. Brandt did not know from where the cars had come on which plaintiff was riding at the time of the accident. John Brown switched the train onto the dowell track. Plaintiff then got on the lead railroad car and was clearly visible to Mr. Brandt. Mr. Brandt could not see that the cars on the main track were across the switch until he got close to the end of the dowell track. No one had told him that the cars were across the switch, and he had no knowledge as to how long they had been there. About half-way down the dowell track when Mr. Brandt realized that the cars on the main line were across the switch, he applied the crane's brakes. The crane was moving approximately four to five miles per hour. The brakes were working, but the crane and the two cars that the crane was pushing started to slide due to the slick rails. Mr. Brandt placed the crane in reverse, but until the collision, the train did not slow down. Plaintiff gave a signal to stop the train, but when he saw that a collision was imminent, he opened the crane's door and hollered to the plaintiff that he could not stop. Plaintiff gave no indication that he heard him.

On the night prior to trial, C & NW's attorney, John Sheppard, had a meeting with most of C & NW's witnesses in a private meeting room near C & NW's yard. The meeting was a social gathering as well as a meeting

in which the attorney discussed proper courtroom etiquette and again interviewed the witnesses for purposes of determining what their testimony would be at trial. At trial, Mr. Noah referred to the transcript of his deposition, which Mr. Sheppard discussed with him, as a script.

The defendant contends that the trial court should have granted a judgment *n.o.v.* contending that even if defendant had fouled the switch, said fouling was not a proximate cause of plaintiff's accident but a mere condition of the accident and that plaintiff was contributorily negligent. Proximate cause is ordinarily a question for the jury (*Felty v. New Berlin Transit, Inc.* (1978), 71 Ill. 2d 126, 374 N.E.2d 203) as is contributory negligence of the plaintiff (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257). Each case must turn on its own facts. To escape liability, defendant must demonstrate that the intervening event was unforeseeable as a matter of law. Under the facts stated herein, we can not conclude that the issues of proximate cause and contributory negligence should have been decided by the court. These issues were properly submitted to the jury.

In the view we take, some of the excerpts of plaintiff's closing argument to the jury, directed mostly at defense counsel, should be set forth in detail and are as follows:

"Now, of course, as the rule came about, we saw the agility of Mr. Sheppard [defense counsel] as he tried to change this situation as it progressed. You know we had this fellow in here that was a very conscientious switchman, Mr. Voyles, who said, 'No, sir, I knew that rule was applicable. I knew that rule was there, but I couldn't fire up that switch. I know that's the reason I split those cars up and put them on two separate tracks.' It is what was necessary; they wanted clear tracks to put them on is what it was or tried to. But the point is that when he started to say that, then Mr. Sheppard said, 'Oh, that rule isn't applicable.' He did the same situation when he was talking to this fellow Cook that he tried to change the rule on. He said, 'OK. Then you did have the rule there. It didn't apply.'

\* \* \*

Mr. Sheppard didn't want it to be discussed then. \* \* \* They created a situation which caused this man's injury. They're responsible. There isn't any dispute about that. That's why Mr. Sheppard is so concerned about it.

\* \* \*

Now, let's go to that situation. We had in this case some controversy that had been created here. We have innuendo that's been implied in the case by Mr. Sheppard that perhaps the cars were moved by somebody else. That perhaps ICG who never

seemed to be in there on that day I pretty well know who was out there that day because we have the records.

Terminal Railroad Association was even suggested although the evidence shows that all this activity was on the South end of the property and not on the North. So it wasn't their's. Or, we could believe that a prankster or somebody who didn't have any business down there in the middle of the night and switched the cars or whatever you want to believe. I mean that's all in this case and Mr. Sheppard has very cleverly put it in the case.

* * *

All right, now, what's the next guy that they send you to try to circumvent the fact that those seventeen cars were down there. The fact that the thing that locked them into this law suit and the thing that Mr. Sheppard has to get rid of is how those seventeen cars get down on the track. What did they do then? He comes in with this fellow Moloansky [sic]. What do we know about him? Well, we know, now Phoenix there is taking a low profile of this case. But we know that during the time this past week or so, he's been in contact with Molansky [sic]. Molansky [sic] told them that. He said, "I had several calls from them." What happened after that? We know that on (let me get my dates straight) on Wednesday evening I guess it was, Molansky [sic] came down prepaid C.O.D. from the CN&W [sic] all his expenses and so forth to the, in downtown St. Louis. That's the one that's got the revolving, most of us don't get there, but it's got a revolving place to eat and everything. Downtown St. Louis. You've seen it, I think. Near the Arch there. And they put him up there that night and the next morning, the evidence shows that Phoenix and Sheppard went over to get him and took him to the private club of Mr. Sheppard's, the Missouri Athletic Club. That's what the evidence shows. So they could prompt him some more. Now most of us have never been to the Missouri Athletic Club either. I think the cost would feed a family of four for a good number of days. But, anyhow, that's where they took him. Nothing was too good for this man. They were going to take him out to the Round Table. He was going to the private club. Well, I'm sure that was a fine environment to discuss this man's case when they set there with their Wall Street Journal with their plush carpet there and they talked about how they connived to beat this man out of his law suit. That's what happened. And when they brought this man over here and Sheppard brought him in with a jesture that here was the guy who was going to solve all the problems, had all the answers. They put him on the stand and he lied about it. He might have

gotten away with something if he hadn't made reports and made statements before. Because he had a lot of information and in my judgment, in my judgment and that's all I can say, that information came from that six course breakfast over there at the Missouri Athletic club. That's where it came from. And what does he now tell us? Oh, he would have us believe that this man, this busy executive that's running this plant over here, this million dollar power plant over here, Kerr-McGee that he has, that he was so— had such a perfect rememberance and that he had nothing to do but sit and look out the back window of that office over there so he could tell you how many cars came in and out of there and where they went and so forth.

And what else did they concoct over there at breakfast that morning over at the Missouri Athletic Club? Why they had this guy come in here and say, 'I saw it down there on the track by the dowel track,' he said. 'I saw it down there by the dowel track and the interception of the main track that there have been cars in and out of there.' Four or five cars he said. Four cars or something tonight. * * * But, the point is that that million dollar business that we're talking about and when these companies inner-relate like they do on million dollar businesses, those problems at C&NW can call up Kerr-McGee and say look, we need some help on this law suit. These corporations despite what you want to say about them, they may bath themselves in a big glamour of integrity and all these kind of things and I'm not saying this has happened here. But, we can pick up any paper today and see where they've bribed officials.

MR. SHEPPARD: Wait a minute. I'm going to object to that now. Talking about bribing people, that's unfair and uncalled for and I think it would be better if we would try—

THE COURT: Just a second Mr. Sheppard. This is argument and I didn't understand him to say C N & W did that. If the jury thought that, they'll be instructed to disregard that. Have a seat sir.

MR. SHEPPARD: Well, that it has no application and even to suggest such a thing deprives the Defendant of a fair trial, Your Honor. I ask that the Court declare a mistrial.

THE COURT: The motion will be denied sir. He's talking about the common ordinary news article.

MR. CHAPMAN: Well if I'm mistaken about what I said, you can judge me on it. But, the point is that this situation.

MR. SHEPPARD: I again renew my objection Your Honor.

THE COURT: To the statement that he just made sir?

MR. SHEPPARD: Yes, to the statement that he just made.

THE COURT: All right. That objection will be denied. Continue Counsel.

\* \* \*

MR. CHAPMAN: There wasn't anything he [Lomanski] said that had any relevancy in this case in the things he said before. It all came out. It was hatched, conceived and committed over at the Missouri Athletic Club.

Now, let me talk about that for a moment. No matter how many of these executives sit around in Chicago or Tulsa or St. Louis or wherever it may be, and talk about this case and connive or whatever they want to do about it, Madison County Jurors are going to decide it. Not them. Mr. Sheppard should learn that if he doesn't know it. This is going to be decided by you Madison County Jurors. It's not going to be decided in Tulsa, Mr. Sheppard, or St. Louis or Chicago. No matter how you go about it. This is your committment.

\* \* \*

When Mr. Sheppard came down there, King John, down there at the Knights of the Round Table and handed out scripts, you know, the information about the testimony.

You remember, who was it? Voyles, Sr. had a script there that he pulled out. He called it a script. They said it was a transcript. But, anyhow, the information about it.

If I've been provocative and ill-tempered in the course of this trial, I'm sure Mr. Sheppard will believe that I have, it's because I feel the awesome responsibility of being the only person that's going to articulate this man's problem and his law suit. I'm oppressed by Lawyers on Kerr McGee and by indirection and all these people and I'm the one thing that stands between this man and them. That's not a very good place to be and I'll be very happy when I complete this case and put that duty to you. You'll have an obligation to protect his interest.

But, I have now—I can't acquit [sic] it until I tell you what I think the damages are and what we ought to do about them. Now, it isn't difficult, I don't think, nor does it require a great deal of time and I have very little anyhow to innumerate [sic] the kinds of problems he had. They're very obvious. I mean here's a man who was active or has a family. I've seen this man get out of his old '60 Falcon, helped out of the car and brought into my office. I know his problems. I've lived with him for two years. I've done everything I can to assist him in this law suit, beyond what I should have done perhaps, I don't know. That's not true. He's a good man. This man is fine. This isn't a man that came in here like a dog in a manger and

came in and said, I can't do it, I want help or anything like that. He's got guts that man has and is. That future is entitled to be compensated. He may someday not be able to take care of hisself [*sic*]. He may not have a wife out there 20 years from now who will be able to assist him in and out of the car and do these things. That's all. He may need a caretaker. We don't know. We know that that—within the confines of the evidence at least.

This case is laid for a million-and-a-half and my personal judgment, you may think less or more, but I think it's a fair reasonable amount. Now I know that's big money and I know some of you are going to say, OH my goodness I din't know there was that much money, but I know horses that are killed and they pay that much for them."

Plaintiff contends that the argument was proper and was a legitimate inference from the evidence produced at trial. Plaintiff directs our attention to defendant's answer to his interrogatories in which two different train crews were listed as having delivered the 17 railroad cars to the Moss-American plant and to the testimony of Mr. Lomanski which appears to conflict with his report filed soon after the accident as being evidence that evidence was manufactured by the defendant. However, we believe that the inferences drawn from the evidence are incorrect. The witnesses who were at the Roundhouse the night before commencement of the trial all stated that Mr. Sheppard had instructed them to tell the truth, but there is no evidence that defense counsel instructed Mr. Lomanski on what his testimony should be at their breakfast. References to the luxury of the Missouri Athletic Club and the Wall Street Journal as contrasted with the statement that plaintiff drove a 1960 Falcon automobile, while not supported by the evidence, are an attempt to inflame the passions of the jury. Contrary to the contention of plaintiff's counsel, we find that the statements of plaintiff's counsel as set forth above accused defense counsel of subornation of perjury and suppression and distortion of evidence.

 We find that due to plaintiff's prejudicial closing argument, defendant was deprived of a fair trial. In his final argument, an attorney is permitted to make only reasonable comments upon the evidence. However, when arguments become unreasonable and highly prejudicial in character, and counsel indulges in misleading statements, improper innuendo and inflammatory remarks, reversal must follow as a matter of course. (*Cecil v. Gibson* (3d Dist. 1976), 37 Ill. App. 3d 710, 346 N.E.2d 448.) It is only when there is something in the record affording a reasonable basis for the statement that charges of dishonesty, bad faith or insincerity in the defense is permissible.

 We note that defense counsel failed to object to many of the

improper statements of plaintiff's counsel. In a case such as the one at bar where prejudicial arguments or improper conduct of counsel affect the case to the extent that the litigants cannot receive a fair trial and the judicial process suffers deterioration, this court may consider such an assignment of error even though no objection was made and no ruling was made or preserved thereupon by court or counsel. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 311-13, 134 N.E.2d 249, 259; *Paulsen v. Gateway Transportation Co.* (2d Dist. 1969), 114 Ill. App. 2d 241, 252 N.E.2d 406.) The seed of suspicion against the defendant had been implanted in the jury's mind by the precipitant action of counsel for plaintiff. Jurors are laymen, and if a fair trial is to be had before them, the issues must be presented fairly and simply. Digressions into an issue which cast a cloud upon the honesty of the opposing side can sometimes make a fair trial utterly impossible. Nevertheless, it is important that courts should stop argument of this character and should direct the jury not to consider it. They should do this on their own motion. (*Rudolph v. City of Chicago* (1st Dist. 1954), 2 Ill. App. 2d 370, 119 N.E.2d 528.) It is the duty of a court to preserve its own dignity and the respect due to the courts and the administration of the law by not allowing an attorney, under the pretense of arguing the case, to indulge in abuse of parties, counsel or witnesses. The constitutional right of trial by jury is not a license for counsel to indulge in abusive and prejudicial conduct in order to gain a verdict, nor does it grant any privilege to embarrass and belittle an adversary before the jury to such an extent that the hope of the adversary to obtain respectful consideration at the hands of the jury is destroyed or seriously jeopardized. *Paulsen v. Gateway Transportation Co.* (2d Dist. 1969), 114 Ill. App. 2d 241, 252 N.E.2d 406; *Vandaveer v. Norfolk & Western Ry. Co.* (5th Dist. 1966), 78 Ill. App. 2d 186, 222 N.E.2d 897.

In chambers during trial, plaintiff made a motion, pursuant to section 46 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 46), to amend the prayer for damages from $1,200,000 to $1,500,000. Defendant did not object, and the motion was granted. After closing arguments were completed, plaintiff's counsel asked to approach the bench, and after leave was granted, a nonreported bench conference took place. After the bench conference, the court stated:

> "Ladies and gentlemen, the Court has allowed an amendment to the prayer for damages, and the prayer has been amended to an amount of one and a half million dollars. All right, with that, ladies and gentlemen, you may retire to deliberate on the issues in this case."

Immediately after the jury retired to deliberate, defendant requested a mistrial on the basis that the court's statement so highlighted the issue of damages as to deprive defendant of a fair trial. The motion was denied.

■■ At oral argument of this cause, plaintiff's counsel stated that the court's statement was not at his request, and defendant's counsel argued that the court's statement was at plaintiff's request. After examining the record on appeal, we have no doubt that the court's statement was made at the request of plaintiff. Assuming, *arguendo*, the court made that statement *sua sponte*, we find that error was committed which, in conjunction with other errors discussed above, deprived defendant of a fair trial. The court's statement was not in writing, which was conducive to juror misinterpretation. The statement of the court, in effect, instructed the jury to consider the damages laid in the complaint and that a finding for the entire amount prayed for would not be improper. (*Illinois Central R.R. Co. v. Souders* (1889), 178 Ill. 585, 53 N.E. 408.) In fact, the jury returned a verdict in the exact amount that was stated in the court's comment. Considering all of the circumstances that existed, the comment was improper and prejudicial in substance and also in timing.

■■ The errors discussed above are the capstones of plaintiff's attempts to prejudice the jury. At one point, counsel asked leave of court to excuse plaintiff as his ambulance had arrived which highlighted the serious nature of plaintiff's injuries. The record further reflects that during cross-examination of one of the witnesses, counsel turned toward the jury and stated he did not believe the witness. Counsel made numerous references to the failure of defense counsel to invite him to defense counsel's interviews with witnesses in order to give the jury the impression that defendant was concealing or concocting evidence. The trial court had to repeatedly admonish both counsel to state an objection and wait for a ruling without giving a speech along with the objection. Therefore, we find that plaintiff's attorney attempted to inflame and prejudice the jury throughout the trial and that the cumulative effect deprived the defendant of a fair trial, resulting in the jury's verdict for the plaintiff.

For the foregoing reasons, we reverse the judgment of the Circuit Court of Madison County and remand this cause for a new trial.

Reversed and remanded.

EBERSPACHER, P. J., and KARNS, J., concur.