PAULA FLOREK, Plaintiff-Appellant, v. PATRICK KENNEDY, Defendant-Appellee.

First District (2nd Division)   No. 1—92—1424

Opinion filed June 22, 1993.

Sorkin & Nusbaum, of Chicago (Carl Nusbaum, of counsel), and Winkler & Gorey, Ltd., of North Riverside (Charles R. Winkler, of counsel), for appellant.

Clifford P. Mallon, of Chicago (Matthew N. Chaconas and Robert T. Guilfoyle, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Paula Florek brought this negligence action after her automobile was struck from behind by defendant Patrick Kennedy when she was stopped at a stop light in August 1987. The circuit court granted her motion *in limine* to bar mention of injuries from prior accidents unless connected by medical testimony, but it denied her motion to amend her complaint to include a count for punitive damages. At trial, plaintiff presented evidence of slightly over $15,000 in lost wages and medical expenses as well as past and future pain and suffering, but the jury awarded her only $15,000. The circuit court denied her motion for a new trial. Plaintiff appeals, claiming that the damage award was palpably erroneous; that the award's inadequacy

also was the result of a prejudicial remark the court made in the jury's presence and from defense counsel's repeated violations of the order *in limine*; and that the court erred in denying her motion to amend the complaint. We affirm.

Eighteen months after the accident, in February 1989, plaintiff filed a negligence complaint, asking for not more than $15,000 in damages. The circuit court later granted her motion to raise the *ad damnum* to compensate for her continuing intermittent pain and discomfort. In her answers to interrogatories, plaintiff stated that she would seek $45,000.

The case was set for trial a number of times but then was continued; one of the dates was June 17, 1991. On that day, plaintiff presented a motion for leave to file an amended complaint adding a count for punitive damages; the court again continued the trial and set a briefing schedule. The motion stated that "there exists a reasonable likelihood that facts will be proved at Trial to support an award of punitive damages [because] a jury can infer from Defendant's conduct that he acted with malice." In her own supporting affidavit, plaintiff stated that after the accident, she saw defendant "trying to go around [her] car," implying that he was attempting to leave the scene of the accident. In another affidavit, James Floyd, plaintiff's boyfriend, stated that when he arrived shortly after the accident, defendant was lying handcuffed on the back seat of a police car and had to try three times before he could sit upright. At this, the police officer commented, "There he is, so drunk he can't sit up." Standing within three feet of defendant, Floyd smelled a strong odor of alcohol on defendant's breath. In addition, defendant's eyes were only half-open, and his speech was slurred when he offered his billfold to Floyd and said, "Take what you want." After argument, the court denied the motion as well as plaintiff's oral motion for inclusion of language to make the order appealable under Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). Other trial dates were set, the first being October 7, 1991. Trial finally began on January 27, 1992.

Defendant had conceded liability, so the trial was only on the questions of the extent of plaintiff's injury from the accident and the amount of damages. Prior to *voir dire*, plaintiff filed a motion *in limine* asking, among other things, "[t]hat the Defendant['s] attorney be barred from cross examination of the Plaintiff's doctor on prior injuries of the Plaintiff that have not been established or connected by the Defendant to the Plaintiff's present injuries." There is no written order in the record granting or denying this motion, but during the hearing on the motion, the following colloquy occurred:

"THE COURT: [Defense counsel can show] that [plaintiff has] had other accidents and that may account for the extent of injury.

[Plaintiff's Counsel]: Oh, yes, if he shows through competent testimony that she had another accident, similar injury that could have crept over here, I don't have any problem with that.

THE COURT: I will allow him to show similar accidents that pertain to the extent of the injury prior, but not to the fact that there is a propensity to have accidents. You've already admitted liability, it would be like—

[Defense Counsel]: No, I have no problem.

THE COURT: But I will allow you to show any similar accidents bearing on the extent of damages, period.

[Defense Counsel]: Right.

THE COURT: Of course.

\* \* \*

[Plaintiff's Counsel]: \* \* \* Again, you know, with [defense counsel's] cross examination of any doctor that I might put on, again, suggesting that there is another injury, unless he's going to tie it up, you know, once you open the door on these things, the jury is going to say, why there's got to be something there.

You know, the cases say if you're going to inquire into that line, then you better bring in evidence to connect a prior accident with a claimed injury in this particular case. And to allow him to fish around and to suggest to the jury that there may be something there and not tie it up, Judge, there could be reversible error.

THE COURT: I agree. It's got to be germane, it's got to be an accident in point [sic]. It can't just be any accident, you know.

[Defense Counsel]: If I do, Your Honor, I would—of course, I will, away from the jury, establish for the Court a tie-in.

THE COURT: All right. If you do that, fine."

In his opening statement, when defense counsel began to say, "We had a lady coming into this accident who had a prior accident, which the evidence will show—," plaintiff's counsel objected. In the sidebar that followed, plaintiff's counsel warned of reversible error though he conceded "if [defense counsel] leaves it at this stage, we probably won't have a problem." After argument, the court instructed defense counsel:

"Well, my ruling is I am not going to restrict you from making that statement at this time. But at the trial, if you want to

make an offer of proof that it's related, in order to comply with the motion *in limine*, then I will let you do it. But at this point, I don't think you can argue to the jury what you are going to do, because you are going to leave something in their mind about another cause of the accident. [Plaintiff's counsel] is absolutely right. If it's not proximate, if it's not related, it's irrelevant. He's absolutely right. He's given you the case. I don't want to have a reversal of error [*sic*]. What else are you going to say about prior accidents?

[Defense Counsel]: That was it.

THE COURT: Well, I am going to exclude that statement."

The court did not instruct the jury to disregard the statement, however.

First to testify after defendant told of his speed at impact was James Floyd. He saw plaintiff every day after her release from the hospital through the end of 1987. Before the accident, she had been a "lively, energetic person"; afterward, she became "moody, lethargic," "a different person," in a lot of pain and depressed. The following year, she engaged in little physical activity.

Plaintiff testified that she had worked as a waitress all her life and, in particular, since March 1981 at the job she had at the time of the accident. Her weekly gross income had been $195 to $200. The first thing she remembered after the accident was a headache and a "tingling and numb sensation" in her arms and legs. When she arrived at the hospital, she first felt the headache and pain in the upper back and neck area; when she was allowed to sit up, she noticed that her right ribs hurt, especially when she took a deep breath. At the hospital, she was given painkillers and muscle relaxants. She left after four hours or so and returned to the accident scene to retrieve something from her car, after which she went to the police station to make a statement at the request of the police.

Plaintiff tried to return to work in January 1988, but after a two-hour shift she was "extremely tired and a little stiff and sore." During a seven-hour shift two days later, she experienced "some difficulty" in bending, stretching, and heavy lifting. Afterward she was "extremely tired and sore and stiff." She never went back. She did not seek employment until March 1988 because she did not feel well enough for any work. Plaintiff described her condition at that time as slightly improved, though with a constant headache, extremely tight shoulder muscles in the neck area, a sore lower back, and restricted bending. She calculated that during the year she did not work, she lost in excess of $10,000 in income. She began to work as a clerk at

the end of July 1988; she is now a supervisor. She has not missed any days from her job as a result of her problems.

The day after the accident, in accordance with the hospital's instructions, she saw her own physician, Dr. Kisielius. He examined her and prescribed a stronger painkiller and a different muscle relaxant. Her foot was sore, and she was "extremely stiff," especially her lower back; she could not bend in either direction. The medication helped but "[t]he headache has always been there." She saw Dr. Kisielius again at the end of the week, at which time he started treatments "similar to an ultrasound" and a series of diathermy treatments to relax the deep muscles in her neck, shoulders, and upper and lower back. She continued with these treatments at least once a week for a year.

Beginning in September 1987, plaintiff simultaneously sought treatment from Dr. Peluso, a chiropractor; he performed some spine manipulation, traction, heat therapy, and ultrasound. She went twice a week for the first six months, and once a week thereafter. Some days, she saw Dr. Peluso in the morning and Dr. Kisielius in the afternoon, which she had "okayed *** with both doctors." In late 1987, Dr. Kisielius referred her to a neurosurgeon, whom she saw three times. He prescribed a painkiller that seemed to help a little. Plaintiff stopped seeing Dr. Kisielius in August 1988 and Dr. Peluso the next month.

In June 1988, plaintiff's employer referred her to Dr. Mark Cavalenes, an orthopedist, for an examination; he did not prescribe any treatment at that time. She did not follow his instructions for physical therapy because she could not afford it. He later wrote her and prescribed a "work hardening" program, but he did not explain what it entailed. In 1989, she also saw a naprapath she has known for 20 years, Dr. Minor; she saw him four or five times. He performed spine and muscle manipulation, ultrasound, and "some electronic tense [sic] machine where they send electrical charge through you." The various treatments did not take the pain away entirely or for long, but they did ease the muscles.

In October 1989, plaintiff returned to Dr. Cavalenes after seeing a television report on fibromyalgia[1] and thinking "my God, that sounds like what I got." She told him she still had the headaches and the pain, and he checked how far she could bend, rotate, and so on. Two weeks later, in November, he prescribed a slightly milder drug than

---

[1]This was described later as a syndrome characterized by diffuse pain, muscle tenderness, associated fatigue, sleeping difficulties, and frequent headaches.

he had before. Between these two visits, plaintiff was involved in an automobile accident in which someone hit the rear door of her car on the driver's side. She described the impact as "just a glancing kind of blow. No—Little damage." She stated that it had aggravated the condition, making the neck and lower back muscles sore and tighter for a couple of days. After that, though, she returned to her former condition.

In 1990, plaintiff testified, she still had the headaches and a stiff, tight upper back and shoulders. She was tired all the time and did not sleep soundly. She saw the naprapath a few times and saw another one for the month of May who was closer to her home. Dr. Thomas Gleason, hired by defendant, examined her in June 1990. On the day of her visit, the subway train on which she was riding shook, causing severe pain in her right lower back. By the time she arrived at Dr. Gleason's office, she was extremely sore and had difficulty walking. She also saw another chiropractor, Dr. Maretta, 12 times in June 1990. In August 1991, plaintiff began to see yet another chiropractor, Dr. Harshfield, who was also an acupuncturist; the acupuncture helped only one day. She saw Dr. Harshfield 12 to 15 times for chiropractic treatment to her neck, shoulders, and lower back, though the bill contains references only to her neck. In January 1991, plaintiff also was examined by a rheumatologist, Dr. Robert Katz, to whom her attorney had referred her.

Plaintiff described her state of health at the time of the trial as follows. She wakes up extremely tired and has a constant headache. Her back is a little stiffer in the morning, so it hurts to walk. The motion of curling her hair in the morning hurts her shoulders. It hurts to get in and out of the car and to roll up the car window. She has to get up and walk around every hour or so at work because her shoulders bother her if she has to sit in one position for too long. She cannot do any heavy lifting. When she arrives home after work, she is totally exhausted and just wants to lie down. She cannot vacuum, mop, clean the bathtub, or lift full bags of groceries. When nervous or under stress, she feels "like somebody has got [her] shoulders and [her] neck and are squeezing them, are pushing on them and are squeezing on them. *** The same with the lower back."

Dr. Martin Massari, a chiropractic orthopedist, testified from the records of Dr. Peluso, who had died prior to trial. Those records indicated that the prognosis for plaintiff had been "guarded," as indicated by the entry that plaintiff had been "released from [his] care having reached maximum recovery" from his treatments despite "a lot of discomfort in her right shoulder." Dr. Massari interpreted the

term "maximum recovery" to mean "maximum medical improvement," not total recovery, saying "It means that the doctor has taken the patient along to the furthest point that he can get that patient well. He can't get that patient any better." It did not mean total recovery. Dr. Peluso had performed spinal manipulation, hot moist packs, and ultrasound; there was no indication in his records of diathermy treatments. The records did not indicate that plaintiff was receiving care simultaneously from another source, except for an unrelated procedure in July 1988, but Dr. Massari observed that it would not be unusual or inappropriate to obtain manipulation treatment from one doctor and physiotherapy from another on the same day. He agreed, however, that two identical treatments on the same day would not be appropriate.

In Dr. Massari's opinion, plaintiff's treatment by Dr. Peluso in 69 visits over one year was both reasonable and necessary, given the information in the records that she had pain and needed treatment for her symptoms, and the charges for the visits to Dr. Peluso ($2,326) were "very reasonable." His opinion would be no different if he knew that plaintiff had received 49 diathermy treatments during the same time period from another doctor. Dr. Massari believed that plaintiff should not perform waitress work or anything similar, which would place undue strain on her shoulders, and that plaintiff's injury could result in residual symptoms. On cross-examination, when defense counsel asked if he had reviewed any records from the time prior to the accident or knew if plaintiff was a patient beforehand, the court sustained plaintiff's objection in accordance with the order *in limine*.

Dr. Kisielius, plaintiff's initial treating physician, then testified by deposition. He first saw her the day after the accident, when she complained of injuries to her neck, lower back and chest, right lower chest, and head. She also had tenderness and pain in her forehead; a very painful, tender neck (mostly on the left side) with rigidity and very limited movement; and pain limited movement in the lower back, which was very tender, especially on the left and in the lumbar area. His provisional diagnosis was severe strain of the neck and lower back; the results of X rays and a brain scan did not change that diagnosis. In addition to diathermy, he had prescribed painkillers, muscle relaxants, and rest. At subsequent visits, when plaintiff continued to complain of pain in her neck going up to the right rear of her head as well as the earlier pain and leg pain, he ordered the same treatment.

In September 1988, Dr. Kisielius' prognosis for plaintiff had been "guarded" based on the length of time since the accident. In his opinion, she could not work as a waitress and was "disabled" during the

13 months he treated her due to her lack of flexibility and her inability to move freely without pain. He testified that the accident would be sufficient to cause plaintiff's injuries; that her symptoms were consistent with her injury; and that her injury would be sufficient to cause future pain and suffering. His bill for $1,225 was fair and reasonable for the treatment he provided. On cross-examination, he conceded that he could observe no pathology from the accident and that her complaints of pain were not the result of anything he could point to on an X ray or similar objective test, but he noted that one cannot see soft tissue injury on an X ray and that rigidity is an objective finding. He had "no idea" whether plaintiff was seeing any other doctors while he was treating her.

Dr. Robert Katz, a rheumatologist who examined plaintiff in January 1991 at her attorney's request, testified that his diagnosis was fibromyalgia, based on information about the accident, plaintiff's subjective symptoms, and his own examination. He described the treatment as a combination of medication, physical exercise, and sometimes other types of pain control. The accident could have caused the condition because post-traumatic fibromyalgia is well recognized, according to Dr. Katz. He later said, "We don't understand the cause and we don't have a cure for [fibromyalgia]," and he admitted that he was depending on plaintiff's history as she told the origin of her complaints and had no independent way of knowing by objective tests or examination whether the onset of the condition started with the accident. Dr. Katz declined to use the word "permanent," but he estimated that plaintiff's pain would last "for a considerable period of time." During cross-examination, when defense counsel asked Dr. Katz if he would not have recommended the chiropractor's treatment, plaintiff's counsel objected but did not ask for a sidebar. The court sustained the objection, commenting in the presence of the jury, "The doctor and the chiropractor have different fields of medicine. One cannot really judge the other. Maybe a doctor could judge a chiropractor, but I don't see a chiropractor telling me about medicine, please."

Dr. Mark Cavalenes, an orthopedic surgeon who treated plaintiff, was the first witness for defendant. He first saw her when she was referred to him for evaluation in June 1988. She had complained of headaches and of tenderness in muscles of both shoulders and neck. In his examination, he found her forward bending movement was "definitely restricted," her "[r]otating or laterally bending to the right and left was *** about 80 percent of normal," and extension was within the normal range. In X rays, he saw spurring in the lumbar area, indicative of chronic instability in the back and changes over

time that could have been caused either by the accident or a congenital condition, though it was probably neither one. His diagnosis had been "low back strain with a pain syndrome" and bursitis in her shoulder as well as "a mild pinching of the nerve." He thought that the accident could have caused the injury to her shoulder but because he had not seen her earlier, he could not be sure to a reasonable degree of medical certainty. The same was true of the lower back strain, cervical strain, and the pain syndrome. When Dr. Cavalenes saw plaintiff in June 1988, it would have been "very difficult" physically for her to work as a waitress. To improve her shoulder function and neck so she could return to work, he recommended a "work hardening" program, that is, exercise connected to the job starting with very light, limited activity and then increasing it. He had hoped that she would return to work in two or three months, but he had no idea if she had followed through with the program.

When Dr. Cavalenes saw plaintiff the following October, she had more restriction in motion in her back. Had it been a soft tissue injury, it should have healed, so he thought that she had fibromyalgia. This condition could have been caused by the accident, he testified, though he could not say so within a reasonable degree of medical certainty. He recommended some flexibility exercises and a short course of steroid treatment. Plaintiff did not tell him that she had been involved in a later accident, and he had no record or recollection of any treatment by others between her June 1988 visit and the second in October 1989. At an examination two weeks later, just after yet another accident, she had told him that the steroid treatment had not helped, and his examination revealed even more restricted movement of plaintiff's neck and shoulder and more discomfort. He prescribed an anti-depressant. Three weeks later, plaintiff's condition was mostly unchanged except for some improvement in flex and extension and some worsening in the shoulder motion. Dr. Cavalenes recommended range of motion therapy, ultrasound, and heat for her shoulder. Based on this last examination, he believed that plaintiff would continue to have pain and discomfort in the future, though he could not say for how long.

Last to testify was Dr. Thomas Gleason, an orthopedic surgeon who had examined plaintiff in October 1990 at defense counsel's request. From his review of plaintiff's medical records and the history she gave him, Dr. Gleason's diagnosis in 1987 would have been that plaintiff had suffered a cervical spine injury as a result of the accident "sufficient enough to cause her pain which was probably secondary to muscle strain." The muscle strain was of the type to heal within six

to eight weeks regardless of treatment, so his recommendation would have been to reduce discomfort, order possible limitation of activities, and prescribe pain medication. In his opinion, Dr. Cavalenes' June 1988 findings concerning plaintiff's shoulder were unrelated to the accident, though he agreed that given that plaintiff could not raise her right arm more than 90° at that time without shoulder discomfort and that her rotator cuff was tender, she could not have worked as a waitress and that the shoulder problems could have been traumatically caused. Furthermore, he testified, by September 1988, any condition that plaintiff had suffered as a result of the accident must have been resolved. He based his opinion on his knowledge of the way strains heal and on the absence of objective findings in plaintiff's medical records, including an unrelated hospitalization record from July 1988 on which a negative notation had been placed at the item "musculoskeletal system" and the admission form noted that plaintiff's neck had been supple.

Dr. Gleason then described his examination of plaintiff. She had normal motion with one exception, normal muscle strength, and normal sensation. Tests for nerve irritation in her arms, for a pinched nerve, and for irritation of shoulder soft tissue were negative. She had not indicated pain with deep palpation of the upper part or back of the shoulder or at the clavicle. There was pain, however, at the lightest touch to the front shoulder, which he could not explain. From plaintiff's complaints, he had expected some wasting of the muscles in the right arm, but his measurements indicated none. Plaintiff could sit upright with her legs straight out (negative Britton test), but in a similar test she could not lie flat and bring her legs up more than 45° without low back pain, an inconsistency that he could not explain. Tests on plaintiff's kneecaps, Achilles tendons, and underside of the feet all suggested normal nerve function.

After this examination, Dr. Gleason's diagnosis was a right cervical radicular syndrome based on subjective complaints but no substantiating objective findings, diminished extension of the cervical spine, soreness in the front of the right shoulder based on subjective complaints, and lumbar syndrome with suggestion of right sacroileitis, again unexplained by objective findings. None of this was connected to the accident, in his opinion, but he did not "know where those complaints are coming from." He did not mention, nor was he asked about, fibromyalgia.

In his closing argument, plaintiff's counsel said, after noting the approximately $10,000 in lost income and $5,207.26 in medical expenses, "So, we have some $15,000 in expenses which I believe is

probably the easiest part of the job that you're going to undertake here. You can say 'let's give her $15,000.' But what do we do about these things, the pain which is reasonably going to continue in the future?" He suggested $50,000 for disability and an additional like sum for past and present pain and suffering. Defense counsel suggested $2,500 to $3,500 for medical bills, pain and suffering, and lost wages of $200 each week for two or three weeks.

The verdict form submitted by plaintiff and signed by the jury did not list the different categories of damages, such as past and future medical bills, past and future pain and suffering, or lost wages. The jury found for plaintiff and assessed damages of $15,000. The circuit court entered judgment on the verdict plus costs.

In her motion for a new trial, plaintiff raised among other things the four issues on appeal. At the argument, when the court suggested that plaintiff had had the right to ask for a mistrial when it made the challenged remark while ruling on the objection during Dr. Katz's testimony, plaintiff's counsel replied:

> "Your Honor, there would be no need for a mistrial had the jury made an award that was fair to this lady. We were almost finished with the case. *** The mistrial would have only started the process over again. Cured the effect, certainly, but *** there was no way for me to take and alter or in any way change the direction that you've [sic] given the jury at that time."

The court explained in response that it had been commenting only that one cannot compare the opinion of one type of doctor to another. The court also disagreed with plaintiff's contention that the motion to amend her complaint had not been filed on the eve of trial, noting that the only reason the trial had not commenced in June was that the court had granted plaintiff a continuance to brief the motion. After argument, the court denied the motion. It found that plaintiff should have moved for a mistrial after its comment and that in any event the statement was not prejudicial; that the damages to be awarded were a question of fact for the jury; and that plaintiff had not presented sufficient facts in the affidavit to sustain a count of punitive damages.

## I

Plaintiff challenges the $15,000 verdict as palpably erroneous because it was less than her medical bills and lost income and thus could not have included any damages for past and future pain and suffering. If the award reflected the jury's finding that not all the lost time

or expense was necessary or related to the accident, she argues further, this conclusion was against the manifest weight of the evidence. She insists that a new trial is warranted when, as here, the damages are manifestly inadequate, or it is clear that the proved elements of damages have been ignored, or if the amount bears no reasonable relationship to the loss suffered by the plaintiff.

The usual rule when reviewing a jury verdict for damages is that

"[t]he amount of the verdict is generally within the discretion of the jury, and a new trial will not be granted on the ground that damages in a personal injury action are too small. [Citation.] However, justice requires that a verdict be set aside and a new trial ordered where the amount of damages is palpably inadequate, or against the manifest weight of the evidence, or where the jury has clearly disregarded a proved element of damages [citation], or where it is apparent that the jury made a compromise between the guilt of defendant and the damages sustained by plaintiff [citation]. The standard to be applied in deciding a motion for a new trial is whether the jury's verdict is against the manifest weight of the evidence, and the trial court's determination of a motion for a new trial will not be disturbed absent a clear abuse of discretion." (*Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 954, 576 N.E.2d 1195, 1202, *appeal denied* (1991), 142 Ill. 2d 654, 584 N.E.2d 129.)

In *Healy*, the court reversed the order denying a motion for a new trial on the issue of damages because the jury award contained sums for medical bills for pain medication and therapy but nothing for pain and suffering. It held that the award was against the manifest weight of the evidence because the inconsistency reflected a disregard for a proved element of damages, for one could not have necessary bills for pain medication without perforce having proved pain. *Cf. Buttita v. Stenberg* (1993), 246 Ill. App. 3d 1012, 1023-24.

■ This case, however, presents a different question. Although neither party mentions it, in a personal injury case tried by a jury, the verdict must be itemized to reflect distribution of the award between monetary and nonmonetary loss, and economic losses must be further itemized as to pre- and post-verdict compensation. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1109.) A circuit court's refusal to instruct the jury as to this form has led to reversal of a damages award on the ground that the refusal made it impossible to evaluate the award's sufficiency. (*Henderson v. Hudson* (1984), 121 Ill. App. 3d 780, 460 N.E.2d 10.) Here, too, the award is impossible to evaluate because the

jury used a general verdict form. This resulted not from the circuit court's error, however, but as plaintiff's counsel conceded at oral argument, he chose to tender the improper form. Because this statutory violation has made it impossible to review the award, we cannot grant the relief plaintiff requests.

Even if we were to review the adequacy of the verdict, moreover, the outcome would be no different. Although the amount of the award here is less than the total of plaintiff's medical bills and lost wages, this does not necessarily reflect the jury's miscalculation, its disregard for a proven element of damages, or a compromise. The evidence on the extent to which these damages could be attributed to the accident was conflicting. On this point, a credibility contest arose between plaintiff's doctors and defendant's expert, Dr. Gleason. The jury could have opted to believe Dr. Gleason, who opined that plaintiff's injury from the accident was the type that resolves by itself within six to eight weeks and that her current complaints were not the result of the accident. From this the jury could have inferred that the reasonable and necessary treatment should have been limited to the first few doctor visits, painkillers, and muscle relaxants, and the past pain and suffering attributable to the accident would have been minimal. In that event, almost all the medical bills and lost wages, as well as all future pain and suffering damages, would not be recoverable. Because the jury could have reached these conclusions, its award cannot be said to have been against the manifest weight of the evidence. Therefore, the circuit court correctly decided to deny plaintiff's motion for a new trial on this point.

## II

Plaintiff claims that the circuit court erred both in finding that its comment about doctors and chiropractors was not prejudicial and in holding that she had waived her challenge to the comment by not having moved contemporaneously for a mistrial. She notes that an appellate court may consider an error to which the affected party did not object when necessary to insure a fair trial and protect the judicial process from deterioration, citing *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383 (failure to object to improper statements during opposing counsel's closing no bar to appellate court's consideration if conduct precluded fair trial). Plaintiff characterizes the error as prejudicial in that it instructed the jury that the law holds chiropractors, the source of over half of her medical bills and much of her supporting evidence, to be less credible and knowledgeable than physicians. She finds analogous

*Lange v. Coca-Cola Bottling Co. of Chicago, Inc.* (1969), 105 Ill. App. 2d 99, 245 N.E.2d 35, *rev'd on other grounds* (1969), 44 Ill. 2d 73, 254 N.E.2d 467, in which the appellate court ordered a new trial because the court commented "That is his opinion. I don't believe that at all" in response to an explanation in the presence of the jury of what the expert witness would say, thereby indicating the weight it would give certain evidence on a material fact in issue. Plaintiff also claims that to have objected at the time would have required the circuit court to apologize or explain and thereby highlight the fact that the court did not regard her witnesses highly. A mistrial within a few hours of the close of the trial, insists plaintiff, would have accomplished nothing that a new trial now will not achieve.

■ It is axiomatic that a lack of contemporaneous objection to trial improprieties usually will be deemed waiver of the right to appeal them, although not moving for a mistrial will not necessarily extinguish the right to a new trial on that issue (*Mazurek v. Crossley Construction Co.* (1991), 220 Ill. App. 3d 416, 424-25, 581 N.E.2d 59, 64). At oral argument, plaintiff's counsel candidly admitted to this court that he had elected not to object and to await the jury's verdict even though he now asserts that the error so tainted the trial as to subject the judicial process to deterioration. In other words, plaintiff's counsel made a conscious decision "to roll the dice," as defense counsel aptly puts it, and now asks this court to place its imprimatur on such conduct by not applying the waiver rule. We refuse to do so. To hold otherwise would countenance, if not invite, deliberate use of this tactic in the future. It also would make a mockery of the waiver rule.

Furthermore, as we noted above, in the absence of an itemized verdict, it is impossible for this court to ascertain the effect of the comment on any particular aspect of the damages. Thus, in the absence of a show of prejudice, we believe that there is no reason to order a new trial on this point. *Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 515, 581 N.E.2d 162, 166 (comments that do not deprive a party of a fair trial do not warrant order for new trial).

## III

■ Plaintiff next singles out two violations of the order *in limine* barring cross-examination of plaintiff's doctors about any prior accident and resultant injuries unless defense counsel could connect the two with expert medical testimony. These include defense counsel's mention in his opening statement that plaintiff had had a prior accident and his cross-examination of Dr. Massari, during which he asked

if, when forming his own opinions, Dr. Massari had considered Dr. Peluso's preaccident records for plaintiff or knew if she had been Dr. Peluso's patient prior to the accident. With these two acts, she continues, defense counsel informed the jury of the earlier accident and prior treatment for the resulting injury. She interprets the award of less than her lost earnings and medical bills as a reflection that the jury found that some or all of her treatments were made necessary by that earlier accident.

We note that,

> "[i]n order for the violation of an *in limine* order to serve as the basis for a new trial, the order must be specific in its prohibitions, and violations must be clear. [Citation.] And, where a violation is found to exist, a new trial may follow only where the violation has prejudiced the [aggrieved party] or denied [it] a fair trial." (*Northern Trust Bank v. Carl* (1990), 200 Ill. App. 3d 773, 778, 558 N.E.2d 451, 456, *appeal denied* (1990), 133 Ill. 2d 560, 561 N.E.2d 694.)

Here, no one suggests that the order was not specific. With regard to the clarity of the violations, the first remark was not made during cross-examination of plaintiff's doctors, it was made only once in passing, the objection was prompt, and the court ruled that it would permit defense counsel to make the statement. Significantly, moreover, during the sidebar following the objection, plaintiff's counsel himself conceded that "if [defense counsel] leaves it at this stage, we probably won't have a problem" with reversible error. As for the questioning of Dr. Massari, the violation is even less certain, for the inquiry did not specifically refer to either the prior accident or its resultant injuries. In addition, the inferences plaintiff draws are not ineluctable. Rather than an attempt to inject information about the prior accident, the questioning could have been interpreted as an attempt to elicit evidence about the length of plaintiff's relationship with Dr. Peluso to ascertain his familiarity with her. As a result, we hold that these two incidents did not violate the order *in limine*. Even if they did, as with the court's alleged error in part II, the lack of an itemized verdict form makes it impossible to ascertain the prejudice from such error.

## IV

Plaintiff insists that the evidence in her affidavit of defendant's attempt to flee and in Floyd's affidavit of defendant's strong odor of alcohol, slurred speech, difficulty in rising to a sitting position, and appearance of intoxication established a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.

Having been presented with this evidence, she reasons, the circuit court had no discretion to deny her motion to amend the complaint and thus should have granted her motion for a new trial on this issue. Plaintiff also contends that the hearsay finding was incorrect because defendant's acquiescence in the police officer's statement is an admission, and even if the police officer's statement could not have been considered, Floyd's affidavit contained other evidence supporting an award of punitive damages that would not be negated by didacting that statement.

The general rule is that the decision to permit an amendment to a complaint is discretionary because the right to amend pleadings is not absolute. (*Trans World Airlines, Inc. v. Martin Automatic, Inc.* (1991), 215 Ill. App. 3d 622, 627-28, 575 N.E.2d 592, 595 (interpreting Ill. Rev. Stat. 1991, ch. 110, par. 2—616).) Timeliness of such motions may be considered (*Trans World Airlines*, 215 Ill. App. 3d at 627, 575 N.E.2d at 595) as may be prejudice or surprise to the other party (*Healy v. Bearco Management, Inc.* (1991), 216 Ill. App. 3d 945, 961, 576 N.E.2d 1195, 1207, *appeal denied* (1991), 142 Ill. 2d 654, 584 N.E.2d 129).

■ Plaintiff brought her motion on the day that trial was to commence. The only reason the trial did not go forward that day was that the court continued the matter in order to permit the parties to brief the motion. Moreover, it was information from plaintiff herself and her boyfriend, information readily available to plaintiff long before the date set for trial, that formed the factual basis for her motion. By waiting until the day of trial to raise these allegations, plaintiff thereby surprised defendant, who had never been put on notice that his intoxication would be placed at issue and who presumably had not prepared a defense to her allegations. Although the circuit court expressly stated during the hearing on the motion for a new trial that the untimeliness of the motion had not been the basis for its ruling, we review the court's orders, not its reasoning, and we may affirm on any basis in the record. Thus, we affirm because this motion could have been denied on the grounds of both untimeliness and unfair surprise.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.